# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | CRIMINAL CASE No: **1:21-CR-96** |
| | ) | |
| **MICHAEL STEPAKOFF,** | ) | SENTENCING: JANUARY 20, 2022 |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Pursuant to Rule 32 of the Federal Rules of Criminal Procedure and the Sentencing Scheduling Order entered in this matter, Document No. 25, Mr. Michael Stepakoff, through counsel, hereby presents to the Court the *Defendant's Memorandum in Aid of Sentencing*.

Mr. Stepakoff, a 56-year-old Messianic Rabbi with a clean record, a loyal husband and loving father to four children, submits to the Court that a reasonable fine is the appropriate penalty for his first offense Class B misdemeanor conviction for *Parading, Demonstrating, or Picketing in a Capitol Building* under 40 U.S.C. §5104(e)(2)(G). Mr. Stepakoff's relevant conduct is nonviolent parading in support of election integrity on January 6, 2021, by entering through open doors of the United States Capitol Building, following a crowd of protesters — where he took photographs of the hallway and shook hands with a police officer — and exited five minutes after entering.

Mr. Stepakoff accepted responsibility for his conduct and pleaded guilty to this petty offense on September 24, 2021. In good faith, he prepaid the government's requested restitution

in the amount of $500 prior to sentencing, even though Mr. Stepakoff had committed no destruction or direct property damage.

Pursuant to §1B1.9 of the United States Sentencing Guidelines, the sentencing guidelines do not apply to Class B misdemeanor offenses. Furthermore, Mr. Stepakoff is facing no mandatory minimums. This Class B misdemeanor petty offense carries a maximum penalty of six months imprisonment and a maximum fine of five thousand dollars, in addition to a ten-dollar special assessment. See 18 U.S.C. § 19; 40 U.S.C §5109(b); 18 U.S.C. §3571(b)(6).

Mr. Stepakoff has received and reviewed the Pre-Sentence Report ("PSR") prepared for the Court, as well as the Sentencing Recommendation, and objects to some of the facts relied upon as inaccurate as they were used to justify the sentencing recommendation of 12 months of probation, 60 hours of community service, and a $1,000 fine, and disagrees with the sentence recommended as greater than necessary for this defendant.

### MICHAEL STEPAKOFF: RABBI MIKE

Michael Stepakoff is a 56-year-old ordained messianic rabbi in Palm Harbor, Florida.



Mr. Stepakoff is fondly called "Rabbi Mike" by his congregation at Temple New

Jerusalem, a messianic temple that he founded over 20 years ago in the Tampa Bay area.



Rabbi Mike conducts community outreach through public speaking and creative media,

engaging in songwriting, book writing, event presentations, YouTube videos, Facebook

engagement, and position papers on the topic of messianic Judaism — a Jewish cultural lifestyle

that accepts Jesus as the Messiah and shares many of the same beliefs as Christianity.



Rabbi Mike also conducts weekly webinars and podcasts to reach Americans throughout

the country who are interested in learning about messianic Judaism.





Outside the religious community, he is known as "Coach Mike." He served as a head coach of youth sports in tackle football and basketball for over twelve years.







Michael Stepakoff was born in Hartford, Connecticut, and raised in Atlanta, Georgia. He graduated from Florida State University and went on to study law at the Stetson University College of Law. He comes from a solid and loving family, both in his upbringing and the family he leads today.

Mr. Stepakoff has been happily married to Tara Stepakoff for 27 years, with whom he proudly raised four wonderful children.

 

Before his rabbinical position, Mr. Stepakoff worked as an attorney. He practiced criminal defense from 1990 through 2000, representing indigent inner-city defendants for state-level offenses in Florida. He was ordained as a messianic rabbi in 1998 while still working as a lawyer. He transitioned into civil litigation in the year 2000 and practiced for six additional years, while simultaneously opening and running his own Temple. He left the legal profession and dedicated himself to religious life full-time in 2006. Of course, Mr. Stepakoff has no criminal record.

## JANUARY 6TH

Michael Stepakoff came to Washington DC for the conservative protest events scheduled for January 5th and 6th. Politicians, activists, and religious leaders advertised rallies, speeches, and prayer groups ahead of the main rally event scheduled for the 6th with President Donald J. Trump. Mr. Stepakoff came to DC on his own to join the protest against election fraud, a demonstration in favor of election integrity. He brought his cell phone to live-stream his coverage of the various speeches and events to his Facebook followers, friends, and his congregation.[1]

On January 5, Mr. Stepakoff walked around the bazaar of speakers who came to take their turn sermonizing in front of the crowds of Trump supporters arriving for President Trump's rally scheduled for the following day. Then he went sightseeing in DC. The 5th was rather uneventful.

On January 6, Michael Stepakoff ventured out to hear President Trump speak at the Ellipse. He stayed for most of the speech but left the area before President Trump concluded the address; he needed to use the restroom and had to return to his hotel. Afterward, Mr. Stepakoff made his way up Pennsylvania Avenue towards the Capitol. He made his way to the Capitol because he expected for there to be another protest event of Trump supporters — as President Trump encouraged his supporters during his speech to make their way towards the Capitol, to protest there. Indeed, there were large crowds of Trump supporters protesting in front of the Capitol when Mr. Stepakoff arrived. He took selfies in front of the Capitol and then followed the crowd of Trump supporters through open doors of the Capitol building.

---

[1] Religious leaders like Rabbi Mike are politically active in order to protect the rights and the interests of their religion and congregation. Like many of the more commonly known Evangelical pastors, Rabbi Mike includes political discussions in his sermons.



Mr. Stepakoff walked in, looked around, took some photographs, shook hands with a police

officer — and then he walked out.  *The five-minute surveillance video depicting Mr. Stepakoff's*

*time in the Capitol shows at least seven of the protestors walking up to a Capitol police officer to*





*shake hands.* Mr. Stepakoff spent five minutes in the hallway of Capitol, half of which was standing against a corner wall, looking down at his cell phone, distracted by his mobile device. When he wasn't on his phone, he walked around the hallway slowly, aimlessly, staying within close range of the entry doors — appearing aloof, incognizant, and out of place.

After walking out, Mr. Stepakoff spent a few minutes on the lawn of the Capitol, again on his phone, and then went back to the hotel. [The defense submits to the court for review *Defense Exhibit 1*, the government's 5-minute surveillance video of Mr. Stepakoff inside of the Capitol.]

After arriving back at the hotel, Mr. Stepakoff began hearing reports of violence at the Trump rally that he had just left. Mr. Stepakoff immediately brushed the stories off as a combination of media embellishment and infiltration by Antifa or other malicious actors who were trying to make Trump supporters look bad.

Indeed, the videos shot by Mr. Stepakoff show peaceful Trump protestors. And, while Mr. Stepakoff was inside the Capitol hallway, there was no violence or destruction in his purview; instead, people were shaking hands with police officers and walking around peacefully.[2]



⬇ *Police officer shaking hands with protestors inside of the Capitol.* ⬇

[2] It is difficult to obtain screen shots of the hand-shaking moments between the officers and protesters. The Defense will rely on the court's review of the Capitol surveillance video that depicts the full 5 minutes of time Mr. Stepakoff spent inside of the Capitol, *Defense Exhibit 1*. The referenced hand-shaking between officers and protestors inside of the Capitol can be seen on the right-hand side of the video, beginning at time strap 3:04:40.

He observed police officers interacting with the Trump supports entering the Capitol, but they were not asking the protestors to leave. The officers' demeanor witnessed by Mr. Stepakoff did not indicate that the protestors who entered the Capitol were a threat to the officers or were committing crimes. Like many, Mr. Stepakoff was unaware that protesting inside the Capitol building was a criminal act.[3]

That same evening, Michael Stepakoff decided to defend the peaceful Trump protestors he observed around him, even writing a Facebook post to comment on how his personal experience differed from what he saw on the news. "There was very little violence in this demonstration, despite the fake news images being shown, it was almost completely a peaceful demonstration within the context of the First Amendment," he declared. It took Mr. Stepakoff a few weeks to comprehend the scope of everything that happened that day.



⬇ *Screen shot of Mr. Stepakoff's video depicting the crowd in front of him.* ⬇

---

[3] Mr. Stepakoff's state of mind is being addressed for the exclusive purpose of mitigation of punishment; it is not being raised as a defense.

At no point on January 6 did Michael Stepakoff comprehend the magnitude of the behavior of the violent individuals in the crowd of Trump protestors.

## THE AFTERMATH

After the Trump supporters left the Capitol, the FBI declared that they were investigating "violent activity" at the Capitol. The very next day, the FBI announced the investment of their full resources into a broader search of "those involved," irrespective of nonviolence or the severity of their individual involvement. On January 8, the DOJ announced their first arrest for nonviolent activity. The FBI's website, to this day, continues to say: "We have deployed our full investigative resources and are working closely with our federal, state, and local partners to aggressively pursue those involved in these criminal activities."



On January 29, 2021, Michael Stepakoff was arrested on nonviolent misdemeanor charges of unlawful entry into the Capitol and unlawful demonstration inside the Capitol. He was released on personal recognizance.

As this case has been pending for the duration of one year, Mr. Stepakoff remained in perfect compliance with his pretrial release conditions.

Mr. Stepakoff met with the FBI at the prosecutor's request and answered all of their questions regarding his participation in the January 6 events — he was cooperative, cordial, responsive straightforward. He made it very clear that he would not have gone inside had he known it was unlawful to enter the Capitol building. Mr. Stepakoff explained to the government that he always thought of the Capitol as Ground Zero for political protest, having seen many prior protests at the Capitol. Mr. Stepakoff is a law-abiding citizen and never wanted for that to change.

Mr. Stepakoff has consistently maintained that he came to the events of January 6 for a political protest — and that is what he did, he protested. Michael Stepakoff was protesting election fraud, a call for election integrity. He was unaware that he committed a crime by protesting inside the Capitol building. *Now, he knows*. Mr. Stepakoff thus pleaded guilty in order to take responsibility for protesting in an area where protest is not permitted.

## THE GOVERNMENT'S POSITION ON "RELEVANT" FACTS

The government has emphasized certain facts that they believe constitute a more robust criminal case against the defendant. These facts are outlined in the *Statement of Facts* filed with

the signed plea deal. While the defense does not dispute the existence of these facts, the defense disagrees with the materiality. It is thus essential to review these facts in context.

1) In paragraph 8, the government points out, "the defendant recorded a video while approaching the United States Capitol Building with a crowd of people. While recording, the defendant stated, 'There comes a time for people to say, 'we're not going to take it.' Here we are taking our stand on Capitol Hill.'"

Mr. Stepakoff was walking to the Capitol, to a protest, to take a stand on Capitol Hill. These words are politically inspiring American phrasing. These words are indicative of protest, nothing more. The government's emphasis on those words is misplaced.

Similar uses:



2) In paragraph 9, the government decided it was relevant to point out that the defendant entered the Capitol building "through a door marked 'EXIT' on the interior of the door."

The government felt the need to point out that the *interior* of the door was marked "EXIT." For reference, the parties agree that this interior "EXIT" sign can only be seen by someone *inside* the building.

The "EXIT" sign was not visible to the defendant at the *exterior,* where he *entered*. Quite simply, Mr. Stepakoff could not see a sign that hangs on the *inside* of a door when he was entering from the *outside*. This "EXIT" demarcation is entirely irrelevant to the case against Mr. Stepakoff— the sign was not only not visible to him from his entry perspective, but also this sign does not indicate that the doors should exclusively be used for exiting. Indeed, this door to the Capitol is used for both entering and exiting the building. This entry "fact" outlined by the government is only relevant to someone piecing together scraps. (Interestingly, the government omitted from their *Statement of Facts* that the defendant walked through open doors, on the other side of which stood Capitol police officers, some fondly interacting with protesters — intriguing and genuinely relevant facts.)

3) In paragraph 9, the government noted a sculpture on the floor in the hallway where the defendant entered. The defendant is not accused of having anything to do with the displacement of this sculpture. The disposition of this sculpture does not change as Mr. Stepakoff is in the building. At no point does Mr. Stepakoff appear to notice this sculpture, which is located entirely out of his scope of view on the security video that depicts this sculpture. Indeed, when the government asked Mr. Stepakoff about this sculpture, Mr. Stepakoff had no idea what they were

talking about. He cannot be reprimanded for something he did not do, something he did not see. Again, this is a "fact" only relevant to someone piecing together scraps.

    4) In paragraph 10, the government highlights the defendant's statement posted on social media a bit after he left the Capitol, "The Capitol is OUR house. Not theirs. The demonstrators today had that in mind…." Mr. Stepakoff is referencing the phrase chanted at the January 6 rally, "Whose house? Our house!"



The "Whose house? Our house!" is a popular chant at football games and political protests. This chant was ubiquitous at Democrat-organized rallies in front of the White House during the Trump presidency.

*In October of 2018, "Whose house? Our house!" was chanted by Women's March protestors on the steps of the Capitol building*.[4]

In the Summer of 2020, the similar chant "Whose streets? Our streets!" echoed at every BLM protest. It has also been popular at Women's March rallies.

This phrase, and its derivatives, denote a spacial occupation or ideological takeover by a crowd of protestors, as opposed to a violent "attack."



---

[4] Video depicting "Whose house? Our house!" Women's March chant at the Capitol: https://twitter.com/caltexona/ status/1048624842243825664?s=20. See also Defense Exhibit B.

Mr. Stepakoff clarified his original statement in a Facebook post on the evening of January 6 — "there was very little violence in this demonstration… it was almost completely a peaceful demonstration…." **Michael Stepakoff also declared that he was against violence**. Mr. Stepakoff's prior words were referencing political protest, not violence or destruction. He makes this very clear.

5) In paragraphs 1 through 7, the government outlines a summary of the facts that relate to their position on how and why the Senate was forced into recess, independent of Mr. Stepakoff's individual involvement.

The government conveniently omits that the Senate recessed at 2:13 PM, as per the Congressional Records, and the House recessed at 2:18 PM — then resumed, and then recessed again at 2:29 PM. Mr. Stepakoff did not enter the Capitol hallway until after 3 PM, after both the



Senate and the House had already been in recess. In fact, Mr. Stepakoff was not even in front of the Capitol at 2:13 PM. He did not know that the House and Senate were in recess, or what led up to it, let alone that his political parading inside the Capitol was a criminal act.[5]

6) In paragraph 10, the government notes that the defendant posted a selfie on social media. *It's not a particularly flattering selfie, we agree.* However, this photograph does not depict criminal conduct or conduct relevant to unlawful protest. Instead, this selfie highlights the defendant's individual perspective of January 6 — he saw himself in a crowd of Trump supporters who were peacefully protesting.



A reminder to the government— protest in favor of Donald Trump is not in itself unlawful. Mr. Stepakoff is accused of unlawfully protesting *inside* of the Capitol building. What renders his conduct unlawful is the particular *location of the protest*, not the nature of the protest itself. Political support for Donald Trump does not constitute unlawful behavior in itself. For that reason, Mr. Stepakoff's favoritism of Donald Trump, or affinity for protestors who share this view, is not a criminal act subject to sentencing consideration.

---

[5] The government's *Statement of Facts* carefully phrases that the Congressional sessions had to be suspended, but the government does not state the reason why. After all, the protestors did not make their way into the building until after the recesses were called. Though this remains unclear, an inference can be made that the recesses were called as a result of the pipe bombs that were located at the RNC and DNC buildings shortly before the recesses were called. See U.S.Senate Media, *Written Testimony of USCP Former Chief of Police Steven A. Sund before the Senate Committee on Rules and Administration and the Senate Homeland Security and Government Affairs Committee*, U.S. Senate (2/23/2021), https://www.hsgac.senate.gov/imo/media/doc/Testimony-Sund-2021-02-23.pdf. This also explains why the House was called into recess at 2:18 PM and then resumed at 2:26 PM. There is no known case connection between the DOJ pipe bomb investigation and the Capitol breach investigations.

It is also important to note that individuals like Mr. Stepakoff were not seeking to commit violence or obstruction; they were seeking to be heard. The government, however, seems to impose a singular intent on the entirety of January 6 participants in their memoranda filed in various January 6 cases, arguing under the assumption that everyone in the crowd wished to criminally interfere with or oppose the government. See, e.g., *Memorandum Order* in *United States v. Judd*, 1:21-cr-40, Document 203, (D.D.C. December 28, 2021). The defense has not seen evidence produced to this effect, only the unsubstantiated, presumptuous arguments made by the government in various pleadings filed in January 6 cases.

## PARTICULARIZED PERSPECTIVE

The government is asking for this court to penalize the defendant based on their summation of the entirety of the evidence collected for the January 6 mass prosecution. What the government is asking this court to do is to punish the defendant for conduct that he did not know about, for events he did not partake in, for destruction and violence he did not witness, for severity he did not experience, and for an effect he did not cause nor could foresee.

The government fails to take into account each protestor's unique, individual perspective. Michael Stepakoff did not know, nor could he predict, that the peaceful political protest by Trump supporters would amount to something entirely different. He did not see these transgressions. It is unethical and inequitable to hold Mr. Stepakoff responsible for the results of a politically heated rally that got out of hand. Mr. Stepakoff should be judged on his participation and what he knew at the time.

The government admits, in a repetitive paragraph which government counsel add to their sentencing pleadings filed in other January 6 protest prosecution cases, that "each defendant should be sentenced based on their individual conduct." See, e.g., *United States v. Felipe Marquez,* 1:21-cr-136, Document 28 (D.D.C. December 2, 2021). Nonetheless, the government *then* asks this Court to disregard this requirement *just this once, just for this group of Trump protestors* — because, they argue, "each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances." *Id.* This is a highly biased request of government counsel — taxpayer-subsidized attorneys who have a professional obligation to promote criminal justice, not political justice, and to ensure that defendants receive due process under the Due Process Clause of the Fifth Amendment. See also *Berger v. United States*, 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."). See also *Lindsey v. State*, 725 P.2d 649 (Wyo. 1986):

> "'The prosecutor… enters a courtroom to speak for the People and not just some of the People. The prosecutor speaks not solely for the victim, or the police, or those who support them, but for all the People. That body of `The People' includes the defendant and his family and those who care about him. It also includes the vast majority of citizens who know nothing about a particular case, but who give over to the prosecutor the authority to seek a just result in their name.'"

> Citing *On Prosecutorial Ethics,* 13 Hastings Const.L.Q. 537-539 (1986).

Government counsel has argued in previous sentencing memoranda: "As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades

and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and likely would have smelled chemical irritants in the air. No rioter was a mere tourist that day." See *United States v. Karl Dresch,*1:21-cr-71, Document 33, (D.D.C. August 3, 2021). Yet, this is simply untrue. Mr. Stepakoff, for example, did not cross multiple barricades — he walked up on the lawn and through open doors of the Capitol, where he positively interacted with Capitol Police and was not asked to leave. Mr. Stepakoff did not observe fighting with law enforcement; he observed Trump supporters lining up to shake hands with Capitol Police officers. Mr. Stepakoff did not experience nor see the use of any chemical irritants. The government's declarations of fact in prior January 6 sentencing briefs are recklessly false with respect to defendants like Michael Stepakoff.

The government also confers one mind, one intent, on all January 6 participants, in the cumulative blame points outlined in the government's repetitive sentencing memoranda in January 6 cases. Yet, Mr. Stepakoff was one of the thousands of people who gathered together for, what was supposed to be, a lawful, organized protest.[6] He did not know anyone else who attended. He came in peace, as did many others. While a few may have come to riot, **people like Mr. Stepakoff came to exercise their First Amendment rights**. There were thousands of protestors in total — who did not know each other and who did not share a singular mind. Only a fraction of the protestors had committed violent acts.[7]

---

[6] See Jenni White, *What I Saw At The 'Save America Rally' In Washington, DC On Jan. 6*, The Federalist (1/11/2021), https://thefederalist.com/2021/01/11/what-i-saw-at-the-save-america-rally-in-washington-dc-on-jan-6.

[7] Only about 225 of the 700+ January 6 defendants have been charged with assault on law enforcement. See Alan Feuer, *Prosecutors Move Quickly on Jan. 6 Cases, but One Big Question Remains*, The New York Times (1/5/2022), https://www.nytimes.com/2022/01/05/us/politics/jan-6-capitol-riot-investigation.html.

Had Mr. Stepakoff been charged as part of a conspiracy, or had he known in advance, or even at the time of, the extent of the lawlessness of some amongst the crowd, maybe the government's attempt a cumulative penalty argument would be more reasonable. But under the fact pattern at hand, the government is engaging in unreasonable overreach and fueling the fires of vindictive prosecution.

Mr. Stepakoff was taking part in a protest in only one portion of the Capitol and at one moment, not at every entrance and not for the duration of the day. The fact that very violent videos emerged in some other January 6 prosecutions does not mean that Mr. Stepakoff had any knowledge or connection to those incidents.

When he walked in, Mr. Stepakoff followed a peaceful crowd into the Capitol, not a violent one. He walked through open doors into a building that he mistakenly thought was Ground Zero for American protest. He was amongst a group of protestors shaking hands with police officers, not attacking them. Not one of these officers asked Mr. Stepakoff to leave, nor made an announcement asking the protesters to exit the Capitol while he was there. Mr. Stepakoff was amongst a group of protestors chatting with officers inside the Capitol, not ones fighting or being ushered out— this is Mr. Stepakoff's unique perspective; this is what Mr. Stepakoff witnessed and participated in.

Michael Stepakoff did not even comprehend the extent of the misconduct of some in the crowd until days later. On January 7, after reading reports of violence and accusations of destruction, Mr. Stepakoff wrote a Facebook post defending the protestors as "peaceful demonstrators," because *from his individual perspective, that is what they were, and that is whom he saw*: "There was very little violence in this demonstration, despite the fake news

images being shown, it was almost completely a peaceful demonstration within the context of the First Amendment." He wrote off reports of violent acts as "fake news." It took Mr. Stepakoff many days to digest the reality of that day.

The government has the advantageous benefit of hindsight and an unprecedented collection of video and photographic evidence on which to prosecute the events of January 6. They do so indiscriminately, copy and pasting the same *Statement of Facts* for each defendant they were able to identify and arrest. Yet, the defendants, who were physically present in a roaring crowd, had a limited viewpoint and did not share the advantage of the government's omniscient luxury while living through the moment. Disregarding what each defendant individually witnessed or experienced on January 6, all defendants are being forced to accept the government's description of what the prosecutors are calling, "*The Attack at the U.S. Capitol on January 6, 2021*," as part of their plea deal's *Statement of Offense*. Those at the DOJ running the show, who never speak to defense counsel, necessitated for each defendant to accept this uniform statement of what happened on January 6 for their case, even if the defendant did not know that a substantial portion of those points had occurred before they entered the Capitol.

***The government's broad-brush perspective of what happened on January 6 ignores the particularized perspective of the individuals in the crowd who came to protest lawfully but who followed the crowd into an unlawful demonstration inside of the Capitol***. Likely, a large portion of the individuals in the crowd did not have a complete picture of what was happening around them, let alone what was happening at other entrances of the Capitol or what happened

that led to the Capitol doors being opened before they walked through.[8] See, e.g., Document 36, Page 7.

Aside from his incognizant disposition on that day, **Mr. Stepakoff did not know *on* January 6 what we know today *about* January 6.** The government's use of facts that Mr. Stepakoff did not know at the time of his petty offense, nor could have known, is unjustifiable overreach.[9] In seeking to punish him for attending a lawful protest that was escalated, by others, into an event of varying degrees of lawlessness, the government is asking for the court to consider facts and circumstances that were never known to the defendant before, or during, his participation in the January 6 rally.

The sentencing phase of a criminal case looks to individual blameworthiness. A sentence must be particularized to the defendant that stands before the court. The sentencing of Mr. Stepakoff should be limited to *his* individual conduct and *his* knowledge of the situation at hand for the charge of protesting or parading in a location where such conduct is prohibited, the United States Capitol building.

### DETERMINING PENALTY FOR A PETTY OFFENSE, CLASS B MISDEMEANOR

Mr. Stepakoff pleaded guilty to a petty misdemeanor offense under 40 U.S.C. § 5104(e)

---

[8] DOJ data one year after January 6 shows that out of the 165 defendants who pleaded guilty thus far, only 6 have pleaded to assaulting law enforcement officers; the others pleaded guilty to nonviolent offenses. See Rubin, Mallin, and Steakin, *By the numbers: How the Jan. 6 investigation is shaping up 1 year later*, ABC News (1/4/2022), https://abcnews.go.com/US/numbers-jan-investigation-shaping-year/story?id=82057743.

[9] The government also relies on evidence of some wrongdoing that occurred *near* Mr. Stepakoff, implying that because he was there he must have known the conduct was unlawful or should have noticed the transgressions. That's not accurate for this defendant, nor a realistic imposition on any human being. We cannot force cognizance or omniscience onto a defendant just because a prosecutor notices something on a video *ex post facto* —observed from a different perspective and at a later time. After all, Monday morning quarterbacks always have it easier, always.

(2)(G) for unlawfully demonstrating inside the United States Capitol Building. See 18 U.S.C. §

3559(a)(7). Pursuant to §1B1.9 of the United States Sentencing Guidelines, the sentencing

guidelines do not apply to Class B misdemeanor petty offenses. Mr. Stepakoff is facing no

mandatory minimums for this offense. This Class B misdemeanor petty offense carries a

maximum penalty of six months imprisonment and a maximum fine of five thousand dollars, in

addition to a ten-dollar special assessment. See 18 U.S.C. § 19; 40 U.S.C §5109(b); 18 U.S.C.

§3571(b)(6). Since unlawful parading in the Capitol building is a petty offense, it does not carry

a term of supervised release. 18 U.S.C. § 3583(b)(3).

Pursuant to his plea deal, Mr. Stepakoff has agreed to pay restitution in the amount of

$500 upon sentencing, but he has paid the restitution in full in advance of his sentencing, in a

showing of good faith.

While the U.S. Sentencing Guidelines do not apply to this defendant, this court is still

required to consider the sentencing factors outlined in 18 U.S.C. § 3553(a) in determining the

appropriate sentence. See 18 U.S.C. § 3551 ("a defendant who has been found guilty of an

offense described in any Federal statute… shall be sentenced in accordance with the provisions

of this chapter…").

The seven factors for this court to consider under 18 U.S.C. § 3553(a) are:

> (1) the nature and circumstances of the offense and the history and characteristics
> of the defendant;
>> [*discussed supra*]
> (2) the need for the sentence imposed to reflect the four primary purposes of
> sentencing, i.e., retribution, deterrence, incapacitation, and rehabilitation;
>> [*discussed infra*]
> (3) the kinds of sentences available (e.g., whether probation is prohibited or a
> mandatory minimum term of imprisonment is required by statute);
>> [*discussed supra*]

(4) the sentencing range established through application of the sentencing guidelines and the types of sentences available under the guidelines;
[*inapplicable, discussed supra*]

(5) any relevant "policy statements" promulgated by the Sentencing Commission;
[*inapplicable under §1B1.9 of the United States Sentencing Guidelines, commentary to which states: "For the sake of judicial economy, the Commission has exempted all Class B and C misdemeanors and infractions from the coverage of the guidelines."*]

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar *conduct*; and
[*discussed supra*]

(7) the need to provide restitution to any victims of the offense.
[*discussed supra*]

While the sentencing court has discretion over imposing an appropriate penalty, Congress has placed limits. For example, a term of imprisonment cannot be imposed or lengthened for rehabilitative purposes, see 18 U.S.C. § 3582(a) and 28 U.S.C. § 994(k); and, a sentence upon revocation of supervised release cannot be imposed for retributive purposes, see 18 U.S.C. § 3583(e). *See also Tapia v. United States*, 131 S.Ct. 2382 (2011). An appropriate sentence is defined as "sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)]." 18 U.S.C. § 3553.

Moreover, any sentence imposed by this Court is limited by the Eighth Amendment's restrictions on excessive fines and cruel and unusual punishment.

## INCAPACITATION, REHABILITATION, RETRIBUTION, DETERRENCE, AND RESTITUTION

***Rehabilitation*** and ***specific deterrence***, in this case, have been achieved through arrest, pretrial supervision with conditions, and year-long prosecution. Mr. Stepakoff had not realized that his political demonstration inside the Capitol was prohibited. He made it clear to the FBI



that he would not have entered the Capitol but for this lack of knowledge. He also made it clear that he is against violence and announced this publicly on January 6. He also explained that he was incognizant of violence amongst the protestors while he was present in the crowd of protestors. Mr. Stepakoff's Facebook posts support his explanation of this understanding at the time he was in DC. The arrest, year-long court supervision with behavioral restrictions, and year-long prosecution for this petty offense — has made it crystal clear to Mr. Stepakoff that First Amendment expression and protest is not without limitation and that he needs to be more careful, moving forward, *where* he protests, and be much more cognizant about *what* is happening around him. Further rehabilitation and specific deterrence are unwarranted for this defendant.

Mr. Stepakoff has been on pretrial supervision with restrictions from the court for the duration of one year, an effective mode of supervision, and ***incapacitation***, in addition to the rehabilitative and deterrent effect this has had. Mr. Stepakoff has been perfectly compliant. There is no need to divert additional public resources for more supervision on a petty offense conviction related to a locational protest offense, for a first-time offender, who was not violent nor supportive of violence. After all, the 56-year-old retired lawyer is a father of four and a Rabbi who leads a congregation. This is not an individual of criminal concern to the American public.

As stated previously, ***restitution*** is not a concern in this case as Mr. Stepakoff has already made a payment of restitution in the amount requested by the government, even though he did not individually damage or destroy any property during his 5-minute visit to the hallway of the Capitol.

In observing these arrests, pretrial restrictions and confinements, and relentless prosecution of January 6 participants through the meticulous reporting of all mainstream media,

the public has been provided with more than sufficient **general deterrence**.[10] The DOJ has even created public-shaming web pages for every defendant, a modern-day version of tar and feathering.[11] The American people have grown genuinely frightened by engaging in any protest against the federal government, a much deeper (and more troubling) general deterrence than is necessitated by penal law. For example, when a protest was organized in support of improving detention conditions for January 6 arrestees, only about 100 people arrived to protest, with police and media vastly outnumbering the protestors.[12] The DOJ has achieved general deterrence through their unprecedented, unyielding prosecution of all defendants, no matter the magnitude of involvement. As a result, jailing peaceful protestors, albeit wrong in how they went about it, would be cruel and unusual under the Eighth Amendment if done for the purpose of general deterrence.

And, **retribution**, in this case, has been accomplished before the arrest — by the general public contributing significantly to the arrest of the individuals photographed at the January 6 rally and inside of the Capitol.[13] A substantial proportion of January 6 defendants have been identified and brought to FBI attention through the public's assistance. Public groups such as *Sedition Hunters* have been formed to identify and report those who may have been involved. Friends, coworkers, and even family members have also reported a substantial portion of January

---

[10] The media has written over 40,000 articles about the January 6 prosecutions, with 48 articles specifically mentioning Mr. Stepakoff's arrest and prosecution. Articles about Mr. Stepakoff can be reviewed here: https://www.google.com/search?q=%22michael+stepakoff%22&newwindow=1&source=lnms&tbm=nws

[11] Mr. Stepakoff's devoted DOJ web page can be found here: https://www.justice.gov/usao-dc/defendants/stepakoff-michael.

[12] BBC News, *Police outnumber protesters at right-wing Capitol rally*, BBC News (9/19/2021), https://www.bbc.com/news/world-us-canada-58612965.

[13] Phil Rogers, '*Sedition Hunters' Seek to Identify Participants in Jan. 6 Capitol Attack,* NBC Chicago (11/24/2021), https://www.nbcchicago.com/investigations/sedition-hunters-seek-to-identify-participants-in-jan-6-capitol-attack/2693284.

6 participants. The FBI, in turn, has provided a sense of satisfaction to those who had made reports by arresting the identified individuals, no matter the size of their role on January 6. Retribution, as a result, had been accomplished upon ameliorating the public through unfettered arrests.

The main aims of sentencing have been accomplished pre-sentencing in this case.

## AVOIDING SENTENCING DISPARITIES

The government will submit Government's Exhibit A, which outlines the variety of sentences that this court has imposed on defendants convicted of various transgressions on January 6. According to the government, January 6 cases are incomparable to preceding criminal cases and thus exempt from fair comparison with any cases that are not January 6 cases. The problem with the government's proposition is that the government is responsible for creating the uniqueness of the January 6 prosecutions.

For example, on the days of October 4 through 6 of 2018, the Women's March had planned to breach the Capitol to shut down Senate deliberations of Trump-nominated Supreme Court Justice Brett Kavanaugh, a constitutionally mandated process under Article II, Section 2 of the United



States Constitution.[14] The Democratic group had publicly announced on Twitter its plans and

training initiatives. "Hundreds are getting trained for direct action this morning," they Tweeted.

"Hundreds of people are being trained for today's #CancelKavanaugh action every 30 minutes this morning. We're going to flood the Capitol," they declared. And then they did.



Reporter Samantha York tweeted, "Police are setting up barricades to contain them." But Women's March protestors broke through barricades set up by Capitol



police and flooded the Capitol building.[15] The Crisis Magazine tweeted, "@womensmarch just took the Capitol. Women,

---

[14] *In photos: Protesters rally against Supreme Court nominee Brett Kavanaugh*, CNN (10/6/2021), https://www.cnn.com/2018/10/05/us/gallery/anti-kavanaugh-protests/index.html.

[15] Adam Rosenberg, *Brett Kavanaugh protesters ignore police barricades, occupy the U.S. Capitol,* Mashable (10/6/2021), https://mashable.com/article/brett-kavanaugh-senate-confirmation-protests-us-capitol.

survivors, and allies walked straight past the police, climbed over barricades, and sat down on the Capitol steps. ... This was inspiring. We're ready for this." The Women's March tweeted, "We were planning to shut down the Capitol Building… they shut it down for us. 1000+ women, survivors and allies have gathered in the Hart Senate Building. Every hallway. Every floor."



More than 300 protestors were arrested on October 4, 2018.[16] Another 101 protesters were arrested the next day, on October 5. And 164 people were arrested on October 6.[17]

Some of these protestors interrupted the Senate session in the middle of a constitutionally mandated process. On October 5, six people were arrested in the Senate Gallery and charged

---

[16] Sophie Tatum, *More than 300 protesters arrested as Kavanaugh demonstrations pack Capitol Hill,* CNN (10/5/018), https://www.cnn.com/2018/10/04/politics/kavanaugh-protests-us-capitol/index.html.

[17] Nahal Amouzadeh, *US Capitol police arrest over 150 anti-Kavanaugh demonstrators*, WTOP (10/6/2018), https://wtop.com/supreme-court/2018/10/us-capitol-police-arrest-over-150-anti-kavanaugh-demonstrators.

with "Unlawful Conduct" under local DC code, according to a Capitol Police press release.[18] The

next day, on the 6th, local news reported, "[o]ne adult female was arrested in the Senate Gallery

in the United States Capitol Building for crowding and obstructing around 2:30 p.m. Around

3:45 p.m., 13 people were arrested and removed from several Senate Galleries. They were also

charged with crowding and obstructing."[19]

These October arrests followed hundreds of arrests in September for Progressive

protesters interrupting the Senate hearings held on confirming Brett Kavanaugh.[20]

Yet, none of the Kavanaugh protestors were charged with a federal offense; all were

charged under the local DC code. Similarly, when Trump supporters were initially arrested on

January 6 for unlawfully protesting in the Capitol, they were also charged under the local DC

code.[21] [22] FBI Director Christopher Wray initially did not appear to be planning to pursue

peaceful Trump protestors for federal offenses, publicly seeking out only those who engaged in

"violence and destruction."[23]

---

[18] Press release, *U.S. Capitol Police Respond to Multiple Instances of Unlawful Demonstration Activities,* United States Capitol Police (10/5/2018), https://www.uscp.gov/media-center/press-releases/us-capitol-police-respond-multiple-instances-unlawful-demonstration

[19] Nahal Amouzadeh, *US Capitol police arrest over 150 anti-Kavanaugh demonstrators*, WTOP (10/6/2018), https://wtop.com/supreme-court/2018/10/us-capitol-police-arrest-over-150-anti-kavanaugh-demonstrators; Ralph Ellis, *Anti-kavanaugh protesters keep up the fight, even after he's confirmed,* CNN (10/6/2018) https://www.cnn.com/2018/10/06/politics/kavanaugh-protests/index.html.

[20] Amanda Becker, *Hundreds arrested in multi-day protests of U.S. Supreme Court nominee*, Reuters (9/7/2018), https://www.reuters.com/article/usa-court-protests/hundreds-arrested-in-multi-day-protests-of-u-s-supreme-court-nominee-idINKCN1LN2K6; Cheyenne Haslett, *Kavanaugh protests escalate, over 120 arrested on Capitol Hill*, ABV News (9/24/2018), https://abcnews.go.com/Politics/kavanaugh-protests-escalate-120-arrested-capitol-hill/story?id=58048599.

[21] Press release, *U.S. capitol police arrests - January 6, 2021,* United States Capitol Police (10/7/2021), https://www.uscp.gov/media-center/press-releases/us-capitol-police-arrests-january-6-2021.

[22] It was not until a few weeks later that the FBI indicted federal charges for these same people. *See, e.g., United States v. John Anderson*,1:21-cr-00215, Document 31 (D.D.C. July 8, 2021).

[23] Press release, *Thirteen Charged in Federal Court Following Riot at the United States Capitol,* DOJ (1/8/2021), https://www.justice.gov/opa/pr/thirteen-charged-federal-court-following-riot-united-states-capitol.

But then something changed. The government made a choice for January 6 participants that the government did not make for the Kavanaugh protestors: all January 6 transgressors will be charged federally, irrespective of the level of involvement and irrespective of the severity of their individual conduct. Director Wray shifted his investigative focus from those who committed "violence and destruction" to the broader group of "those who participated."[24] This is why peaceful protestors like Michael Stepakoff were charged federally instead of under the local DC code.

Unlike local DC charges, Federal charges carry significantly more weight and more expense. Reviewing a Kavanaugh case prosecution and case disposition under DC law illustrates the sharp contrast.

Sandra Steingraber was one of the Kavanaugh protesters arrested in the Gallery for disrupting the Senate proceedings. She was arrested by Capitol Police but charged under local DC code for the offense of "Crowding, Obstructing, or Incommoding" under the Code of the District of Columbia § 22–1307, which penalizes the act of engaging "in a demonstration in an area where it is otherwise unlawful to demonstrate and to continue or resume engaging in a demonstration after being instructed by a law enforcement officer to cease engaging in a demonstration."[25] The DOJ chose not to get involved. As such, the case was dismissed in DC soon as Ms. Steingarber paid a $50 fine. She was able to obtain this favorable outcome without counsel under DC's "post-and-forfeiture" procedure, which is a streamlined dismissal for a

---

[24] Press release, *Director Wray's Statement on Violent Activity at the U.S. Capitol Building*, FBI (1/7/2021), https://www.fbi.gov/news/pressrel/press-releases/director-wrays-statement-on-violent-activity-at-the-us-capitol-building-010721.

[25] Compare to Mr. Stepakoff, who is charged under 40 U.S.C. §5104(e)(2)(G), which makes it unlawful to willfully and knowingly "parade, demonstrate, or picket in any of the Capitol Buildings." A mirror version of this law appears under D.C. Code § 10–503.16(b)(7), which also makes it unlawful to willfully and knowingly "parade, demonstrate, or picket within any of the Capitol Buildings."

person charged with certain misdemeanor offenses that allows a defendant to post and

simultaneously forfeit a particular sum of money, thereby obtaining a full and final resolution of

the criminal charge. Moreover, a "post and forfeit" is not an admission or adjudication of guilt.



    This was not her first charge or arrest.

Ms. Steingraber had at least one prior arrest in DC

at the time— and for the same conduct. And, Ms. Steingraber was not an anomalous case — the

hundreds of other Kavanaugh protesters arrested in September and October received identical

charges and dispositions.[26]

---

[26] Joe Johns, *CNN Newsroom Live*, CNN (10/6/2018), http://edition.cnn.com/TRANSCRIPTS/1810/06/cnr.02.html;
Tara Bahrampour, *Most of the protesters arrested during Kavanaugh confirmation have been released*, The
Washington Post (10/8/2018), https://www.washingtonpost.com/local/social-issues/most-of-the-protesters-arrested-
during-kavanaugh-confirmation-have-been-released/2018/10/07/da7c76f0-ca46-11e8-
a360-85875bac0b1f_story.html.

Mr. Stepakoff, by direct comparison to Ms. Steingraber, did not enter the Senate Gallery as she did. He entered the Capitol hallway through an open door and stayed near that doorway for the duration of his *five-minute-faux-pa* inside of the Capitol. Unlike Ms. Steingraber, Mr. Stepakoff did not directly interrupt Senate proceedings — the Senate recessed about 47 minutes before Mr. Stepakoff's arrival. And, unlike Ms. Steingraber, Mr. Stepakoff did not plan nor realize the criminality associated with his behavior and had a clean record walking in. Both posted political thoughts on social media prior to their arrest, with Ms. Steingraber also feeling free to post support for her conduct after her arrest.[27]

Comparatively, Mr. Stepakoff's conduct is significantly less culpable. Yet, Ms. Steingraber walked away with a $50 fine and a dismissal under local code (and no legal fees) while Mr. Stepakoff was federally prosecuted for one year, not offered any kind of dismissal disposition, placed on supervised pretrial release for one year during the prosecution, and is awaiting the potential of a sizable penalty. How? And, why?

The most significant difference between the two — politics. Mr. Stepakoff entered amid a crowd of Trump supporters while Ms. Steingraber was with a progressive women's group.

The government has made it clear that their federal diversion programs, which are touted on their website as "enhancing a fair and efficient criminal justice system," will not be offered to any January 6 participant, even though the DOJ also advertises that, "[e]ach case is subject to

---

[27] Following her arrest, Ms. Steingraber tweeted: "I was one of the women in the Senate gallery who disrupted the vote. Everything about the process leading up to that vote seemed illegitimate." Available publicly at: https://twitter.com/ssteingraber1/status/1048980210211872769. Two years later, she tweeted: "Woke up thinking about the day Brett Kavanaugh was confirmed by the Senate and 13 women stood up in the gallery, 1 by 1, to disrupt the vote and were arrested and media reported they were screaming but actually they were making statements about sexual assault. I was one of them." Available publicly at: https://twitter.com/ssteingraber1/status/1323618700457627650. According to D.C. Superior Court online records, Ms. Steingraber has been arrested two additional times after the Kavanaugh incident, for the same type of charge, and it has been identically disposed of under the post-and-forfeit disposition.

individualized review for appropriate disposition."[28] Individuals who happen to be January 6

participants need not apply. *See also Memorandum Order* in *United States v. David Lee Judd*,

1:21-cr-40, Document 203, (D.D.C. December 28, 2021) (detailing complete dismissal

dispositions for Progressive-motivated federal *felony* cases in Portland, Oregon).

      The government would chime in right about now with their extravagant claim that

January 6 participants are the biggest threat to our Republic, or as the government has described

in their regurgitative sentencing memoranda, "the attack defies comparison to other events" (an

audacious disregard for 1983 Capitol bombing).[29] Yet, the government's evidence does not

support this claim. More accurately, January 6 was a political rally that got out of hand, revealing

security weaknesses at our Capitol and the emotional weaknesses of certain Trump

demonstrators.[30] And, of course, it revealed some violent actors within the Trump crowd—a

---

[28] *Diversion Programs*, United States Attorney's Office - District of Columbia (3/3/2021), https://www.justice.gov/usao-dc/diversion-programs.

[29] It is important to note that January 6 was not the most destructive event to occur at the Capitol in recent years. The 1983 left-wing extremist bombing at the Capitol blew out "a wall partition and windows, ripping through the Republican Cloakroom, and damaging several works of art on the second floor. The bomb appeared to have been placed on or under a window well seat in a corridor leading to the Senate chamber," according to the Washington Post. See Ronald Kessler, *Capitol Bombing*, The Washington Post (11/9/1983), https://www.washingtonpost.com/archive/politics/1983/11/09/capitol-bombing/ed242af4-418f-4d8d-8819-3ba860b425ba. The damage from the politically-motivated explosion cost "at least $1 million to repair," in 1980's currency, according to the Post, which would be over $3.14 million in today's value when accounting for inflation. The combined damage from January 6 is less than half that value, at $1.5 million.

Furthermore, no deadly weapons were discharged in the Capitol on January 6. In fact, FBI Executive Assistant Director Jill Sanborn's sworn testimony before the Senate Judiciary Committee on January 11, 2022, revealed that only two January 6 participants were charged with firearms offenses — and they did not bring firearms inside of the Capitol; another three had firearms offenses added for conduct unrelated to entry into the Capitol. Available at https://www.judiciary.senate.gov/meetings/the-domestic-terrorism-threat-one-year-after-january-6. Comparatively, the significantly more serious 1983 Capitol bombing was the discharge, in the Capitol, of weapons capable of mass casualty and mass destruction.

[30] For example, one Capitol police officer claims she was outnumbered 450 to 1, armed with only a baton. Timothy Bella, *Capitol Police officer sues Trump on Jan. 6 anniversary, saying he 'directed the mob' to violence*, The Washington Post (1/7/2022), https://www.washingtonpost.com/dc-md-va/2022/01/07/capitol-riot-trump-police-lawsuit-kirkland.

group of supporters, which, until the 6th, had been known for peaceful and family-friendly rallies.[31]

There were also some malicious individuals among the Trump supporters — but those individuals are exactly that: individuals. They were not part of any known group plan or deliberation, certainly not in any way known to Mr. Stepakoff.[32] In fact, *there was no group plan or group deliberation, at all, to enter the Capitol on January 6*. **The government's collective evidence clearly shows that entry into the Capitol on January 6 was but a collection of politically-inspired, protesting individuals, some of whom succumbed to mob mentality**. As such, the defendant must be treated as an individual. And, as an individual, the defendant's conduct is significantly less perilous than that of Ms. Steingraber, who, by the way, was part of a group that pre-planned their unlawful conduct.[33]

---

[31] See Jenni White, *What I Saw At The 'Save America Rally' In Washington, DC On Jan. 6*, The Federalist (1/11/2021), https://thefederalist.com/2021/01/11/what-i-saw-at-the-save-america-rally-in-washington-dc-on-jan-6 ("We were absolutely, completely shocked beyond comprehension to hear of any violence, considering our previous experience at Trump rallies and after hearing the president's speech at this one."). See also John Daniel Davidson, *'We Just Wanted Our Voices To Be Heard.' Capitol Protesters Speak Out*, The Federalist (1/14/2021), https://thefederalist.com/2021/01/14/we-just-wanted-our-voices-to-be-heard-capitol-protesters-speak-out.

[32] The FBI watched Michael Stepakoff for several days prior to arresting him— photographing him entering and leaving his home, waking his dog, etc. (As a reminder, Mr. Stepakoff was suspected of committing only misdemeanor offenses related to unlawful entry into the Capitol; he was never accused of violent or felonious conduct; he was not known to the FBI or local law enforcement for any wrongdoing and he had no criminal record — other than once being fined for "*lawn sprinkling on unauthorized day*," which the FBI saw as relevant for their file as a type of "criminal history," even though it is not.) On a Friday morning, the FBI executed a full search of Michael Stepakoff's home and seized his clothing and digital devices. They were looking for evidence of planning, motive, intent, etc., related to advance plans to enter the Capitol, according to the 69-page Affidavit for a Search Warrant. They found absolutely nothing to corroborate the wild inquiry.

Relatedly — to truly comprehend the genuine kindness that embodies Michael Stepakoff, one must look to his reaction to the search of his home, interrogation of his wife and kids, and seizure of his personal belongings. Mr. Stepakoff, who apparently harbors an unwavering affinity for law enforcement, actually complimented and encouraged the agents and officers rummaging through his personal belongings, thanking them for their service and saying, "I know you guys are just doing your job."

[33] See Joe Johns, *CNN Newsroom Live*, CNN (10/6/2018), http://edition.cnn.com/TRANSCRIPTS/1810/06/cnr.02.html.

And yet, the government advises that they will recommend for Mr. Stepakoff to be sentenced to a two-week period of confinement plus three years of probation — on top of the already imposed $500 restitution and the criminal conviction.[34] This recommendation is absolutely excessive and outlandish, especially when compared to all Capitol-related incidents, not just January 6.[35]

The government's disparate treatment of the Kavanaugh case Capitol arrestees has resulted in the government's disproportionate sentencing requests for January 6 protestors. The deliberate omission of federal prosecution of the Kavanaugh political protestors is how the government justifies the claim that January 6 participants could only be compared to other January 6 participants for purposes of criminal penalty imposition. The government ignores the fact that the *DOJ caused this disparity* by only having prosecuted January 6 defendants. As we learned from the logic of *Wickard v. Filburn*, 317 U.S. 111 (1942), a deliberate *decision not to do something* can create a legally-significant substantial impact through that inaction. The question here is whether the government's decision not to charge Kavanaugh protestors under federal law "exerts a substantial effect" on the comparable sentencing cases available to this court (to borrow phrasing from *Wickard*). And the answer, as we have explored here, is — yes. *See United States*

---

[34] Counsel for the government advises that their sentencing recommendation is based on Mr. Stepakoff's prior work as a *Florida*-barred lawyer (Mr. Stepkoff stopped practicing law two decades ago), rendering him as someone who should have known better about *DC* law. Such a position would not even justify a recommendation for a DC CLE, let alone a two-week jail sentence plus three years of probation. As a reminder, even FBI lawyer Kevin Clinesmith, who was prosecuted for altering an email used to justify wiretapping of a former Trump campaign aide, while in the performance of his legal duties, did not receive a jail sentence of two weeks plus three years probation — Mr. Clinesmith received a sentence of one year of probation. See *United States v. Clinesmith*, 1:20-cr-00165, Document 46 (D.D.C. January 29, 2021).

[35] Counsel for the government did not notify the defense of their sentencing recommendation until 1:08 PM on January 11, 2022, the day that sentencing memoranda were due, despite repeated inquiry from the defense. In the months leading up to the plea and sentencing, the government never indicated they would be seeking a jail sentence. Instead, counsel for the government led the defense to believe that a sentence of probation would be sought unless the government's understanding of the case facts was altered during the FBI interview. The facts that the government relies upon to justify their two-week sentence recommendation were known to the government from the inception of this case. The defense, therefore, cannot help but feel entirely deceived by the government.

*v. Griffin*, — F. Supp. 3d —, 2021 WL 2778557 at *7 (D.D.C. July 2, 2021) ("Disparate charging decisions in similar circumstances may be relevant at sentencing"). *See also Memorandum Order* in *United States v. Judd*, 1:21-cr-40, Document 203, (D.D.C. December 28, 2021) (suggesting that disparate charging decisions by the government could be considered at sentencing).

Had the government charged the Kavanaugh protestors for corruptly interfering with Senate proceedings, for breaking through barriers that marked cordoned off and restricted areas at the Capitol building, or for unlawfully protesting or parading at the Capitol, this court would have had comparable dispositions to consider for January 6 cases. But the government deliberately ignored the conduct of the Kavanaugh protestors and created the lack of comparable cases for this court to consider in sentencing individuals like Mr. Stepakoff. As such, the government should not be rewarded, and Mr. Stepakoff should not be penalized, for the government's incongruent, disparate charging decisions. The DC sentences of the Kavanaugh protestors should be considered in sentencing Mr. Stepakoff to meet the ends of justice.

## APPROPRIATE SENTENCE FOR MICHAEL STEPAKOFF

Mr. Stepakoff should have walked away with a dismissal disposition and a $50 forfeiture after his arrest, like Ms. Steingraber. Instead, he has been punished for the duration of one year through supervised release and prosecution, and then convicted under federal law— albeit of a petty offense. And, Mr. Stepakoff has paid a $500 restitution value to the government for the conduct of others.

January 6 defendants, however, have been punished much more harshly than Ms. Steingraber. Sentences for the petty offense of unlawfully protesting inside the Capitol have ranged from a fine with two months of probation to incarceration, community service, and up to five years of probation. See Appendix to Government's Sentencing Memorandum.

Nonetheless, Mr. Stepakoff stands out. Comparing Mr. Stepakoff to other nonviolent January 6 protestors who have already been sentenced, his conduct is significantly less grievous.

January 6 participant Danielle Doyle, for example, has been sentenced on October 1, 2021, to two months of probation and a $3,000 fine, in addition to restitution. See Government Exhibit A. Ms. Doyle entered the Capitol through a broken window, then explored multiple floors of the Capitol.[36] Mr. Stepakoff, in contrast, entered through open doors and shook hands



---

[36] See Capitol Breach Cases, *Doyle, Danielle Nicole*, DOJ (10/4/2021), https://www.justice.gov/usao-dc/defendants/doyle-danielle-nicole.

with police officers, then exited 5 minutes later, never leaving the front entrance hallway. Comparatively, Mr. Stepakoff's conduct is deserving of a lesser sentence than Ms. Doyle's.

Another January 6 participant, Eliel Rosa, entered the Capitol through open doors. He walked through the Capitol hallway, on the entry floor, for the duration of approximately 15 minutes.[37] Since Mr. Rosa was indigent and could not afford a hefty fine, he was sentenced on October 12, 2021, to 100 hours of community service with 12 months of probation, presumably to supervise the completion of the community service in addition to the standard January 6 restitution payment. Mr. Stepakoff stayed in the Capitol for a third of the time that Mr. Rosa remained in the Capitol, staying by the entrance for the duration of his time in the building, while also positively engaging with law enforcement officers standing in the hallways with him. Once again, as compared to this January 6 defendant, Mr. Stepakoff's conduct is deserving of a lower sentence.

The government's recommendation for a sentence significantly higher than the ones imposed on these two January 6 defendants is entirely unjustifiable; the government is seeking a constitutionally-unsound sentence that would violate the cruel and unusual clause of the Eighth Amendment if imposed.

Considering the Kavanaugh arrest dispositions and the January 6 case dispositions in context with Mr. Stepakoff's conduct, a reasonable penalty for Mr. Stepakoff (in addition to his already imposed penalty of year-long prosecution, pretrial supervision, conviction, and payment of restitution) should be no more than a $50 fine. The sentence proposed by the defense is

---

[37] See Capitol Breach Cases, *Rosa, Eliel*, DOJ (10/13/2021), https://www.justice.gov/usao-dc/defendants/rosa-eliel.

sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a), and within the limitations places on this Court by the Eighth Amendment.

## OBJECTION TO PRESENTENCE REPORT & SENTENCING RECOMMENDATION

The United States Probation Office has submitted a Presentence Report and a Sentence recommendation of 12 months probation, 60 hours of community service, and a $1,000 fine. To justify this sentence, a Justification was drafted summarizing the facts of this case. The facts as recited are inaccurate. The list of factual corrections are outlined below:

- Mr. Stepakoff never breached a security perimeter. He did not pass any barrier to get to the Capitol, and he walked through open doors once there. The Capitol police officers inside the building were not in any way blocking the entrance.

- Mr. Stepakoff did not enter the Capitol "to block the Certification" of the election; he entered the Capitol as a continuation of his protest on the issue of election fraud.

- Mr. Stepakoff did not cause any damage to the Capitol.

- There is no evidence that Mr. Stepakoff "intended to impede, disrupt, and disturb the counting of electoral votes" — he was there to protest election fraud.

- Mr. Stepakoff never texted his wife that it was dangerous where he was located. There is no text message sent from Mr. Stepakoff to this effect — the government has Mr. Stepakoff's phone and text message records, and this alleged text message simply does not exist. This is an incorrect assumption made from a message his wife posted on Facebook where she stated two separate things: (1) that Mr. Stepakoff went inside

the Capitol, and (2) that it is dangerous where he was. Mr. Stepakoff never stated the second portion to his wife; the second part is an assumption that his wife made after seeing the news. His wife knew that Mr. Stepakoff was inside the Capitol because he called her later to tell her about his day— they spoke via phone, not text. The screenshot of the Facebook post shows it was made well after 4 PM, over an hour after Mr. Stepakoff exited the Capitol building.

The defense also objects to the recommendation as greater than necessary for this defendant, and as relying on facts not in evidence in this case in order to justify the greater punishment, based on arguments presented *supra*.

## ORAL ARGUMENT

Mr. Stepakoff hereby reserves the right to make a statement and offer any additional sentencing arguments of his choosing at his Sentencing Hearing, currently scheduled for January 20, 2022.

## CONCLUSION

The appropriate sentence for Michael Stepakoff, a 56-year-old Messianic Rabbi with a clean record, a loyal husband and loving father to four children, is a fine in the amount of $50 for his first offense Class B misdemeanor conviction for *Parading, Demonstrating, or Picketing in a Capitol Building* under 40 U.S.C. §5104(e)(2)(G). Mr. Stepakoff's relevant conduct is nonviolent

parading on January 6, 2021, by entering through open doors of the United States Capitol

Building — where he took photographs of the hallway and shook hands with police officers —

and exited within five minutes.


Date: January 11, 2022

Respectfully submitted,
By Counsel:

_____/s/_____
Marina Medvin, Esq.
*Counsel for Defendant*
MEDVIN LAW PLC
916 Prince Street
Alexandria, Virginia 22314
Tel:  888.886.4127
Email: contact@medvinlaw.com


## CERTIFICATE OF SERVICE FOR CM/ECF

I hereby certify that on January 11, 2022, I will electronically file the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

_____/s/_____
Marina Medvin, Esq.