UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                                                       ) | CRIMINAL CASE NO: **1:21-CR-96** |
| ) | |
| MICHAEL STEPAKOFF,                     ) | SENTENCING: JANUARY 20, 2022 |
| ) | |
| DEFENDANT.                 ) | |

## DEFENDANT'S RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM

In seeking an extraordinary penalty for a parading Rabbi, the government has filed a memorandum with blatant misrepresentations of fact which amount to what could only be described as a shameless attempt at character assassination. All the while, the government asks for this Court to impose a penalty higher than one authorized by law — one of both probation *and* incarceration. The defendant, therefore, through counsel, responds herein.

## THE GOVERNMENT'S MISREPRESENTATIONS OF FACT

The defense will present the government's misrepresentations and inaccuracies in a bullet-point outline for easier reference by the Court.

A) The government introduces Michael Stepakoff in their memoranda as "a former attorney suspended from the practice of law and a member of the clergy." The government later claims that Mr. Stepakoff is of questionable credibility due to a temporary law license suspension. The government justifies their request for a jail sentence and a 3-year term of probation based partly on this issue. Yet, the government misrepresents these facts to the court, deliberately omitting relevant context that directly contradicts their position.

i. Mr. Stepakoff advised the government that he practiced state-level criminal law in Florida over two decades ago, representing indigent defendants. He also advised that he stopped practicing criminal law 22 years ago.

ii. Mr. Stepakoff went on to explain that he practiced civil litigation for a brief period after that, but stopped altogether in 2006, and has since been answering a higher calling as a Rabbi.

iii. Mr. Stepakoff also revealed and explained that he was suspended from the practice of law for a period of 6 months, agreeing to the suspension after a four-year legal battle with a former client from a civil litigation issue that occurred in 2002. The suspension was for an issue that took place 20 years ago.

iv. The government invested taxpayer funds to investigate the two-decade-old Florida state bar disciplinary issue. The records indicated that Mr. Stepakoff accurately described the situation.

v. The government also knew that Mr. Stepakoff was again eligible to practice law once the brief six-month suspension period was completed, but he instead chose to pursue messianic rabbinical work. He remains so engaged to this day.

vi. The government had the audacity to allege in a public pleading that Mr. Stepakoff is somehow untrustworthy based on this issue — *the very old issue that he, in good faith, voluntarily brought to the government's attention and accurately represented.* Compare Mr. Stepakoff to the government, who intentionally misrepresented this issue to the Court in knowingly seeking an excessive penalty for the defendant. The government knew that he told them the truth; he volunteered the information and they corroborated his statements, and then the government sent the defense a copy of the corroboration! Yet he is *now* untrustworthy? Why? Just because of words following a comma in the title of the disciplinary rule. The government has pointed to no conduct of Mr. Stepakoff to warrant such shameful ridicule.

vii. The government is fully aware that Mr. Stepakoff is a full-time Messianic Rabbi and has been working exclusively as a rabbi for at least 16 years. Other than to drive an excessive penalty, why would he be introduced as "a former attorney suspended from the practice of law and a member of the clergy," when the government knows he hasn't practiced law since 2006? There is no other explanation.

viii. Why would the government question Mr. Stepakoff's unawareness of Capitol trespass laws when they know full well that he has never been barred in DC, never practiced law in DC, and only practiced state-level criminal law in Florida? And, *even that* was over 22 years ago. Again, *the only reason* is an attempt to drive up a disproportionately high sentence.

ix. On page 20 of their Sentencing Memorandum, the government states that Mr. Stepakoff is a "nonpracticing attorney" — yet he is not a "nonpracticing attorney" licensed in any state; he is a Rabbi. Mr. Stepakoff retired from the practice of law in 2006, allowing his bar membership to lapse, and has not sought to renew his law license since that time — therefore not eligible to describe himself as an "attorney" or a "nonpracticing attorney."



A former attorney or retired lawyer is legally distinct from a "nonpracticing attorney," a status that indicates an inactive but continuous level of bar membership.

x. In what other Class B misdemeanor case has the government ever dug into a defendant's two-decade-old bar discipline history in an attempt to justify jail time for a first-time non-violent offender accused of protesting in an area where such conduct was unlawful? I have seen ZERO such instances. Indeed, the government spends less time investigating the character backgrounds of convicted felons. Even the Florida Bar does not look to bar discipline history that far back, restricting their public display of attorney discipline history to the past ten years.[1]

---

[1] See Member Profile, *Michael Gary Stepakoff*, The Florida Bar, https://www.floridabar.org/directories/find-mbr/profile/?num=861057.

    xi. Moreover, the government is fully aware that one of their own lawyers, Kevin Clinesmith, who falsified information in the course of his federal employment that resulted in personal damages to civilians, received *no jail time* for his conduct and only one year of probation, when he was convicted in this District. See *United States v. Clinesmith*, 1:20-cr-00165, Document 46 (D.D.C. January 29, 2021). Mr. Clinesmith's conduct was substantially more egregious than anything that Mr. Stepakoff has been accused of doing. Yet, the government omits mention of the *Clinesmith* case in their argument, even though this court must consider the issue of sentencing disparities per 18 U.S.C. § 3551 and 18 U.S.C. § 3553(a).

    xii. The defense, therefore, objects to the Court's consideration of Mr. Stepakoff's 20-year-old temporary bar suspension, as well as his employment as a state-level criminal defense lawyer 22 years ago.

B) The government states that Mr. Steakoff claimed "that he believed that he was authorized to enter the U.S. Capitol during the riot on January 6." Instead, Mr. Stepakoff stated that he was unaware that it was unlawful to enter the Capitol. He made no claim of an affirmative right to enter. The government certainly understands this distinction, yet presents to the Court the inaccurate words as if the distinction is inconsequential.

C) The government continuously refers to "a violent attack" on the Capitol. Of course, there were some individuals on January 6 who were violently attacking officers at the Capitol. These were the minority. There were also nonviolent protestors who peacefully entered the Capitol to protest, albeit unlawfully. Michael Stepakoff entered the Capitol amongst a group of nonviolent protestors. Michael Stepakoff's entire time in the Capitol was recorded on the Capitol's security cameras which show his nonviolent entry. But the government does not rely on their security video as primary evidence for the court to consider at sentencing. Instead, the government asks the court to look at the conduct of others in sentencing this defendant. This is rather incredible when considered against the backdrop of federal sentencing hearings. In what other case has the government chosen to shelve their primary evidence against the defendant and instead rely on euphuistic descriptions of the conduct of others who were present at different locations or at different times?

      i.    Moreover, according to the FBI's FD-302 memorandum titled "(U) Interview of Michael Stepakoff on 9/13/21," ("FBI FD-302") the FBI agent notes, "Stepakoff did not see violence or anyone breach the Capitol. When Stepakoff arrived outside the Capitol, he walked left with a group of people because he was curious as to what was going on in front of him … If he had seen any violence, Stepakoff would have done a U-turn and walked away."

D)    The government claims injuries to "more than one hundred law enforcement officers" but is fully aware that during Mr. Stepakoff's time in the Capitol no officers were injured and that the officers and protestors were peacefully engaging, with at least seven protestors shaking hands with the officers. According to the FBI FD-302 referencing the interview with Mr. Stepakoff, on his way out of the Capitol, he "approached one of the officers and told him thank you for his service, we love you, and God bless you." The relevant conduct in a criminal sentencing is the defendant's conduct and the defendant's knowledge at the time of the offense, not the conduct of others who bear but a locational, political, or temporal connection to the case.

E)    The government claims that "Stepakoff saw rioters scaling the walls and other warning signs for danger as he approached the entrance to the Capitol." The government cleverly omits what the individuals were doing who scaled the walls once they got to the top — *they waved flags*. That's it. Flags. Certainly, it's dangerous to climb a wall, but not to people walking by. And flags, surely, are not dangerous.

      i.    In truth, the government describes an event of civil disobedience and imposes on Mr. Stepakoff, a man passing by, a responsibility to cease the exercise of his First Amendment right just because someone in the crowd around him has done something questionable. Certainly, the government does not ask peaceful individuals involved in BLM protests to stop their free expression just because someone else in the crowd had committed a crime.[2] Why should Mr. Stepakoff be treated any differently?

---

[2] For example, at a BLM protest in DC on June 1, 2020, 316 individuals were arrested. Casey Tolan, *DC police made far more arrests at the height of Black Lives Matter protests than during the Capitol clash*, CNN (1/9/2021), https://www.cnn.com/2021/01/08/us/dc-police-arrests-blm-capitol-insurrection-invs/index.html.

    ii. As for entering the building, Mr. Stepakoff, "saw a line of about 6 law enforcement personnel standing. They made no indication that people could not enter the building," the FBI FD-302 reads in reference to Mr. Stepakoff. "If he had seen any violence, Stepakoff would have done a U-turn and walked away."

F) The government claims that Mr. Stepakoff "should have known that his actions were both unlawful and dangerous." Yet the government has no evidence to corroborate the claim that Mr. Stepakoff did anything dangerous; indeed, there were multiple police officers present during his entry into the Capitol and not one of them asked him to leave or showed any concern for his conduct. Mr. Stepakoff did not behave dangerously. Entry into the hallway of the Capitol was certainly unlawful and unwise — but Mr. Stepakoff's actions were not "dangerous."

G) The government claims that because the Capitol doors had been breached, by someone else and at a time before Mr. Stepakoff arrived, he should go to jail.

    i. The government asked Mr. Stepakoff whether he saw anyone breach those Capitol doors and learned that he was not even present when this occurred. The government conveniently excludes this tidbit. The FBI FD-302 reads, "Stepakoff did not see violence or anyone breach the Capitol. When Stepakoff arrived outside the Capitol, he walked left with a group of people because he was curious as to what was going on in front of him."

    ii. In all the evidence collected from Mr. Stepakoff and thousands of others, none indicate that he ever witnessed or was near a breach of the doors through which he later entered.

H) The government claims that because other individuals entered the Capitol through a window, Mr. Stepakoff should go to jail.

    i. The government asked Mr. Stepakoff whether he saw individuals climbing through windows near the entrance he walked through and he said no. The video clearly shows that he does not look in the direction where some enter through a window. The same goes for a statue that the government claims was on the ground. Mr. Stepakoff had no idea what the government was talking about with reference to the statue, even after watching the CCTV videos. The FBI FD-302 corroborates this: "Stepakoff did not see people entering the Capitol through broken

        windows. Stepakoff did not see a wooden podium on the ground when he entered the Capitol nor did he see broken windows because he was not paying attention."

        ii. Furthermore, Danielle Doyle, who did enter through a window received a fine and two months of probation, not a jail sentence.[3] The government's request for a jail sentence based on the window entry of others is thus absolutely ridiculous.

I) The government claims that Mr. Stepakoff "spread false information on social media glorifying the events of on January 6" — yet Mr. Stepakoff believed what he was saying is absolutely true, and he told the government as such. "After watching the news, Stepakoff was in denial and did not believe there was widespread violence at the Capitol. Stepakoff initially believed the violence was caused by Antifa," the FBI agent wrote in his FD-302.

        i. Even if a hypothetical defendant knew such information was false, there would still be no basis for incarceration on such grounds. Kavanaugh protesters readily defended their actions after their arrests, as did the 2017 inauguration arrestees.[4]

J) Indeed, Mr. Stepakoff did not know that entering the Capitol was unlawful. The government claims disbelief and surprise at this. (*The government's choice not to prosecute any other individuals other than this group might have had something to do with the out-of-state January 6 participants being unaware of the associated criminality*.) Mr. Stepakoff had his face open and shook hands with a police officer. Is this the behavior of a man who believes he is breaking the law? Of course not. Sure, Mr. Stepakoff once worked as a lawyer. But he never practiced in DC, and the government knows this. Mr. Stepakoff practiced criminal law in Florida and stopped doing so 22 years ago. See also Paragraph A *supra*.

K) Knowing full well that "storming the gates, so to speak" is a religious euphemism (the FBI agent who interviewed Mr. Stepakoff admitted that indeed he knew the religious phrase and its innocuous meaning) the government nonetheless chose to use this langue to imply something

---

[3] See Appendix to Government's Sentencing Memorandum; Capitol Breach Cases, *Doyle, Danielle Nicole*, DOJ (10/4/2021), https://www.justice.gov/usao-dc/defendants/doyle-danielle-nicole.

[4] Associated Press, *Government drops charges against all inauguration protesters*, NBC News (7/6/2021), https://www.nbcnews.com/news/us-news/government-drops-charges-against-all-inauguration-protesters-n889531 ("'The solidarity we showed as defendants won out,' said one defendant whose charges were dropped.").

other than what it knew the phrase to be — just to bolster their case against the defendant. "Storming the gates of heaven" is a religious phrase that indicates prayer *in front of the gates of heaven*. It does not imply criminal intent to unlawfully enter heaven. Nor the Capitol. In fact, Mr. Stepakoff was clearly describing the peaceful protest *in front of the Capitol* when he used the expression. The protestors were already *storming the Gates* when he made the statement, by "standing outside the Capitol" and roaring in protest — that is what Mr. Stepakoff described in his video. This was yet another shameless stab at the Rabbi.

The FBI agent interviewing Mr. Stepakoff made a note in his FD-302 regarding the expression:

> Below-listed Agent read Stepakoff part of a video he took while walking to the Capitol in which Stepakoff said "A million strong, at least a million, standing outside the Capitol storming the gates, so to speak, is gonna make them think twice about what they are going to do today. Most importantly, Vice President Pence is gonna have to think long and hard, if he hasn't already, about what he's gonna do because he's got the most authority here. God bless America." Stepakoff indicated "storm the gates" was a common expression used in prayer, similar to "storm the gates of hell." Trump asked people to come to the rally. Stepakoff wanted Pence to do something. When Stepakoff made that video, he was not planning on entering the Capitol. Stepakoff wanted to influence Pence's decision by lawful means. Stepakoff is sorry there was violence.

L) The government's accusation of "willful blindness" directly contradicts their case-specific evidence in this matter. The video of the offense depicts an incognizant, aloof, unassuming man who appears out of place and unaware of what's happening around him. The government's novel imposition of a standard of omniscience on a defendant as key to avoiding jail time is plainly absurd. We do not jail people for what they didn't do, didn't notice, or didn't see. We live in a crowded world with all types of people in it. Michael Stepakoff isn't James Bond — and that's okay, he lives on with the consequences of his personality.

M) The government argues at sentencing that the "attack" interrupted the certification of the 2020 Electoral College vote count, yet their own *Statement of Facts* is careful not to make this assertion. After all, the protestors did not make their way into the building until after the recesses

were called in both the House and the Senate. It appears most probable that the recesses were called as a result of the pipe bombs that were located at the RNC and DNC buildings shortly before these recesses were called.[5] This also explains why the House was called into recess at 2:18 PM and then resumed at 2:26 PM. There is no known case connection between the DOJ pipe bomb investigation and the "Capitol Breach" investigations. Regardless, Mr. Stepakoff did not enter the Capitol until after 3 P.M.

N) The government states that "Stepakoff's continued insistence that he did not understand that he was not permitted to enter the Capitol Building … call into question both the extent of his remorse and whether he would make a similar bad decision… ." The reason why Mr. Stepakoff insists that he did not know that it was unlawful to enter the Capitol is because *he did not know*. This has nothing to do with remorse, it has to do with the truth. **The government appears to ask Mr. Stepakoff to lie and to state that he did know at the time that his behavior was unlawful, trying to lure him into some sort of brownie point reward system for "remorse." This is unethical and would be a fraud on the Court. Mr. Stepakoff did not know what he did not know, and he will not lie, even to appease the Federal government.**

  i. The FBI FD-302 clearly notes: "If he had seen any violence, Stepakoff would have done a U-turn and walked away."

  ii. As for Mr. Stepakoff making "a similar bad decision" — Mr. Stepakoff stated to the FBI that had he known it was unlawful to enter the Capitol, he would not have done so, that *he wishes he did not enter now that he knows it was a criminal act* to do so. He then repeated it. And then he repeated it again. He later repeated this once more to the pretrial probation officer. This statement is the definition of remorse.

  iii. The FBI FD-302 also states: "Stepakoff now realizes entering the Capitol was wrong. At the time he did it, he did not think it was wrong."

---

[5] See U.S. Senate Media, *Written Testimony of USCP Former Chief of Police Steven A. Sund before the Senate Committee on Rules and Administration and the Senate Homeland Security and Government Affairs Committee*, U.S. Senate (2/23/2021), https://www.hsgac.senate.gov/imo/media/doc/Testimony-Sund-2021-02-23.pdf.

## THE GOVERNMENT SEEKS AN UNLAWFUL PENALTY

This court's ability to penalize a defendant is not unlimited. Instead, the penalties for each conviction are limited by the United States Code, which authorizes this Court to order limited punishment for a defendant convicted of a particular offense. Pursuant 18 U.S.C. § 3551, this court *only* has the power to impose (1) a term of probation, (2) a fine as authorized, **or** (3) a term of imprisonment. The Court must choose one penalty but cannot impose all of them — note Congress' use of a disjunctive "*or*" instead of a conjunctive "*and*" in the enumeration of the penalties. An exception is carved out in 18 U.S.C. § 3551 for a fine — a fine is explicitly permitted to be tacked to another penalty.[6] No other tacking or conjunctive exceptions are specified.

**§ 3551. Authorized sentences**

(a) IN GENERAL.—Except as otherwise specifically provided, a defendant who has been found guilty of an offense described in any Federal statute, including sections 13 and 1153 of this title, other than an Act of Congress applicable exclusively in the District of Columbia or the Uniform Code of Military Justice, shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

(b) INDIVIDUALS.—An individual found guilty of an offense shall be sentenced, in accordance with the provisions of section 3553, to—
 (1) a term of probation as authorized by subchapter B;
 (2) a fine as authorized by subchapter C; or
 (3) a term of imprisonment as authorized by subchapter D.

A sentence to pay a fine may be imposed in addition to any other sentence. A sanction authorized by section 3554, 3555, or 3556 may be imposed in addition to the sentence required by this subsection.

**§ 3561. Sentence of probation**

(a) IN GENERAL.—A defendant who has been found guilty of an offense may be sentenced to a term of probation unless—
 (1) the offense is a Class A or Class B felony and the defendant is an individual;
 (2) the offense is an offense for which probation has been expressly precluded; or
 (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense.

---

[6] Invoking this penalty range, the penalties for 40 U.S.C. §5104(e)(2)(G), which are outlined in 40 U.S.C. §5109(b), only permit a fine, imprisonment for up to six months, or both.

Then, 18 U.S.C. § 3561(a)(c) repeats Congress' limitation on the Court to order both probation *and* imprisonment, stating that probation may be ordered **unless** the defendant is sentenced a term of imprisonment for the same offense. See also *United States v. Martin*, 363 F.3d 25, 35 (1st Cir. 2004) ("both § 3551(b) and § 3561 require a district court to choose between probation and imprisonment when imposing its original sentence").[7]

Congress did not stop there — they also expressed the intent for penalties under U.S. Code to be ordered fairly, stating more broadly that an appropriate criminal sentence is defined as one that is "sufficient, but not greater than necessary." See 18 U.S.C. § 3553.

Just as there is no authority to impose the conjunctive penalty, there is also no notification to the defendant.

The U.S. Code serves as notice to all People as to U.S. crime and punishment. Therefore, Courts cannot impose penalties in excess of these notifications without running afoul of the Fifth Amendment's Due Process Clause and the standard of fair notice to defendants. See *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574 (1996) ("Elementary notions of fairness enshrined in this Court's constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose."); *Winters v. New York*, 333 U. S. 507, 515 (1948) ("The standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil

---

[7] *Accord United States v. Medenbach*, 729 Fed. Appx. 606, 607 (9th Cir 2018) (unpublished) ("It is therefore plain error for a judgment to impose, as a condition of probation, a continuously served custodial sentence."); *United States v. Andrade-Castillo*, 585 Fed. Appx. 346, 347 (9th Cir. 2014) (unpublished) ("This combination of probation plus a term of imprisonment was unlawful [] even when the custodial component of the sentence is limited to time served."); *United States v. Baca,* No. EDCR 11–0001–VAP, 2011 WL 1045104, at * 2 (C.D. Cal. March 18, 2011) (vacating conviction for a petty misdemeanor due to improper "split sentence" for both incarceration and probation); *United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (in Class B misdemeanor case, vacating joint sentence of incarceration and probation because "a period of 'straight' imprisonment cannot be imposed at the same time as a sentence of probation").

sanction for enforcement."); *United States v. Allen*, 983 F.3d 463, 472 (10th Cir. 2020) ("… the Due Process Clause requires that criminal laws have clear prohibitions and penalties, because persons 'of common intelligence cannot be required to guess' what conduct the law prohibits and what penalties apply when the law is violated."); *Lankford v. Idaho*, 500 U. S. 110 (1991) (due process violated because the defendant and his counsel did not have adequate notice that judge might impose death sentence); *Jones v. United States*, 526 U.S. 227 (1999). See also *United States v. Batchelder,* 442 U.S. 114, 121 (1979) (discussing the rule of lenity as it applies to sentencing and to substantive provisions used in determining penalties); *Miller v. Florida,* 482 U. S. 423 (1987) (Ex Post Facto Clause violated by the retroactive imposition of revised sentencing guidelines that provided longer sentence for defendant's crime); *Bouie v. City of Columbia*, 378 U. S. 347 (1964) (retroactive application of new construction of statute violated due process). Nowhere in the U.S. code is notification given to the People that the Court can impose a combined sentence of both probation and incarceration for a Class B misdemeanor offense.

In this case, the government seeks a penalty of imprisonment **and** a penalty of probation, **for the same offense**, in violation of both 18 U.S.C. 3551 and 18 U.S.C. 3561. This Court has no authority to order the penalty requested by the government, nor has the defendant received adequate notice prior to the date of the offense that this is a penalty permitted by law. The penalty requested by the government is plainly unlawful. This penalty is also excessive under 18 U.S.C. § 3553. The government cites to an unpublished decision in support of their unconstitutional proposition, a case that did not address these statutes, nor Due Process, in addition to some decisions from District-level judges in cases where the defendants did not raise

an objection to this penalty. The Bill of Rights and the Code of the United States embody the binding law on this Court.

The government's overreaching arguments are neither persuasive nor binding on this court. Nor is the government's overtly overzealous persecution of a Rabbi in any way impressive, especially when considering this behavior against the backdrop of the government's objective duties to both the People and the defendant. See *Berger v. United States*, 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."); see also *United States v. Ward*, 63 F. Supp. 2d 1203 (C.D. Cal. 1999) ("The prosecutor speaks not solely for the victim, or the police, or those who support them, but for all the People. That body of `The People' includes the defendant and his family and those who care about him.")(*internal citations omitted*).

The defendant, therefore, objects to the government's requested sentence as unconstitutional, unlawful, and unjust.

## Conclusion

In an extraordinary act, the United States government has asked this Court to imprison a Rabbi for peacefully entering the Capitol in an act of protest, looking around, and shaking hands with a police officer, exiting 5 minutes after entering. The government audaciously goes beyond that — asks this court to impose a penalty harsher than the one authorized by law, *and*

misrepresents Michael Stepakoff's legal background and character in a shameless attempt to jail a Rabbi.

As argued in the *Defendant's Memorandum in Aid of Sentencing*, the appropriate sentence for Mr. Stepakoff, a 56-year-old Messianic Rabbi with a clean record, a loyal husband and loving father to four children, is a fine in the amount of $50 for his first offense Class B misdemeanor conviction for *Parading, Demonstrating, or Picketing in a Capitol Building* under 40 U.S.C. §5104(e)(2)(G).

Date: January 18, 2022

Respectfully submitted,
By Counsel:

_____/s/_____
Marina Medvin, Esq.
*Counsel for Defendant*
MEDVIN LAW PLC
916 Prince Street
Alexandria, Virginia 22314
Tel:  888.886.4127
Email: contact@medvinlaw.com

## CERTIFICATE OF SERVICE FOR CM/ECF

I hereby certify that on January 18, 2022, I will electronically file the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

_____/s/_____
Marina Medvin, Esq.

