```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2    _____

3    United States of America,    ) Criminal Action
                                   ) No. 1:21-cr-00096-RC
4                     Plaintiff,   )
                                   ) Sentencing (via Zoom)
5    vs.                           )
                                   )
6    Michael Stepakoff,            ) Washington, D.C.
                                   ) January 20, 2022
7                     Defendant.   ) Time:  11:00 a.m.
     _____

8
                 Transcript of Sentencing (via Zoom)
9                         Held Before
            The Honorable Rudolph Contreras (via Zoom)
10                United States District Judge

11   _____

                      A P P E A R A N C E S
12
     For the Government:     Alison Prout
13   (via Zoom)              UNITED STATES ATTORNEY'S OFFICE
                             FOR THE NORTHERN DISTRICT OF GEORGIA
14                           Richard B. Russell Federal Building
                             75 Ted Turner Drive, Southwest
15                           Atlanta, Georgia 30303

16   For the Defendant:      Marina Medvin
     (via Zoom)              MEDVIN LAW PLC
17                           916 Prince Street, Suite 109
                             Alexandria, Virginia 22314

18
     Also Present:           Sherry Baker, Probation Officer
19   _____

20   Stenographic Official Court Reporter:
     (via Zoom)              Nancy J. Meyer
21                           Registered Diplomate Reporter
                             Certified Realtime Reporter
22                           333 Constitution Avenue, Northwest
                             Washington, D.C. 20001
23                           202-354-3118

24

25
```

1        P R O C E E D I N G S

2            (REPORTER'S NOTE:  This hearing was held during the
COVID-19 pandemic restrictions and is subject to the
3   limitations of technology associated with the use of
technology, including but not limited to telephone and video
4   signal interference, static, signal interruptions, and other
restrictions and limitations associated with remote court
5   reporting via telephone, speakerphone, and/or
videoconferencing.)

6

7            THE COURTROOM DEPUTY:  This is Criminal Action 21-96,

8   United States v. Michael Stepakoff.

9            For the United States, I have Alison Prout.  For Michael

10  Stepakoff, I have Marina Medvin.  Our probation officer today

11  is Sherry Baker, and also joining us today is Special Agent

12  Brandon Merriman.  Our court reporter is Nancy Meyer.

13           All parties are present.

14           THE COURT:  Good morning, everybody.

15           All right.  Let's start with -- hold on one second.

16  Let's start with the colloquy for proceeding by

17  videoconferencing.

18           The Chief Judge in this district has authorized the use

19  of videoconference for sentencings because they cannot be

20  conducted in person without seriously jeopardizing public

21  health and safety.  We're prepared to proceed by

22  videoconference for this hearing.

23           Ms. Medvin, do you believe that proceeding today via

24  videoconference rather than I mean, waiting until a hearing can

25  be safely held in person is in the interests of justice?

```
 1              MS. MEDVIN:  I do, Judge.  Thank you.
 2              THE COURT:  Okay.  And let's make just a short record
 3     as to why it makes sense to proceed today rather than waiting
 4     until who knows when, when COVID goes away.
 5              MS. MEDVIN:  Well, Judge, this case has been ongoing
 6     for over a year now.  My client has been on pretrial probation.
 7     And, quite honestly, I think that -- considering the offense
 8     that he's facing and the conduct at issue, his background, I
 9     think at this point the Court should decide whether probation
10     at this point is even necessary.  I don't want his pretrial
11     probation to be a higher sentence than an actual sentence
12     imposed, quite honestly.
13              THE COURT:  Okay.  I agree with all that.
14          Mr. Stepakoff, do you agree, after having consulted with
15     your counsel, to participate in today's sentencing hearing
16     using videoconference rather than --
17              THE DEFENDANT:  Yes.
18              THE COURT:  -- being physically present in the
19     courtroom?
20              THE DEFENDANT:  Yes, Your Honor.
21              THE COURT:  Okay.  Are you comfortable with the
22     videoconferencing equipment made available to you?
23              THE DEFENDANT:  Yes, I am.
24              THE COURT:  Do you have an ability to consult with
25     your counsel in private, if necessary, during this proceeding?
```

1          THE DEFENDANT:  I do.  I guess I would just text her,

2     if I needed to do that.

3          THE COURT:  Okay.  And the software, the Zoom

4     software, also has an ability for the courtroom deputy to put

5     you and Ms. Medvin in a separate room, so to speak, in which

6     the other parties are not part of.  So if you want to have that

7     sort of conference during the proceeding, just ask, and we'll

8     go ahead and do that.  And you'll be in a separate room where

9     you'll have privacy to consult with her.  Do you understand?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  The Court finds that the use of VTC is

12     necessary because it is not practical to appear in person, and

13     proceeding by VTC today is justified because the interests of

14     justice will be harmed without a prompt hearing.  And the

15     defendant, after consultation with counsel, has consented to

16     proceeding in that fashion.

17        Mr. Stepakoff and Ms. Medvin, have you reviewed the

18     presentence report as revised following the defense and the

19     government's submissions?

20          MS. MEDVIN:  We have, Judge.

21          THE COURT:  Okay.  Are there any remaining disputes

22     other than those identified in the papers?

23          MS. MEDVIN:  No.  The ones that we submitted are the

24     ones that we dispute.

25          THE COURT:  Same question for the government.

1          MS. PROUT:  No, Your Honor.  The government provided

2     a clarification, and it has been adequately, I think, noted and

3     addressed, and we have no objections.

4          THE COURT:  Under Federal Rule of Criminal Procedure

5     32(i)(3)(A), the Court will accept the presentence report as

6     its findings of fact on issues not in dispute.

7          The defendant has pleaded guilty to a Class B

8     misdemeanor to which the sentencing guidelines do not apply.

9     Therefore, I will assess and determine the proper sentence in

10    this case by reference to and consideration of all the relevant

11    factors pursuant to the sentencing statute found at

12    18 U.S.C. 3553(a).

13         The defendant has pled guilty to Count 4 of the

14    information; that is parading, demonstrating, or picketing in a

15    Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).

16         The defendant has no criminal history.  The maximum term

17    of imprisonment for this offense is six months, and the maximum

18    fine is $5,000.

19         Would the government like to address the Court regarding

20    sentencing?

21         MS. PROUT:  Yes, Your Honor.

22         And -- and we would add as well that there is a maximum

23    term of probation of five years in this case.

24         Let me start by saying that I have reviewed the Court's

25    comments in its prior sentencing in the January 6th case, and

1    I'm familiar with some of the Court's questions in that case.

2    I will do my best to address those issues throughout my

3    presentation today.

4         As the Court notes, we are here today because the

5    defendant unlawfully paraded, demonstrated, or picketed inside

6    the U.S. Capitol Building on January 6th.

7         And the focus of this sentencing, as in every

8    sentencing, should be on this defendant and how the 3553(a)

9    factors apply to him.  And that is what I'd like to concentrate

10   my presentation on.  But before I get there, there are three

11   brief points I would like to address in response to issues

12   raised by the defense in its briefing for today.

13        The first is the defense's claim that it feels deceived

14   by the government's sentencing recommendation today.  As the

15   defense is well aware, the parties' plea agreement expressly

16   states that there are no other agreements between the parties.

17   So there was never a guarantee that there would be a probation

18   recommendation in this case.  And, in fact, the defendant -- or

19   defense actually asked the government to agree to a probation

20   recommendation in the plea agreement, and the request was

21   refused.  So any claim that the defense was somehow tricked by

22   the government's recommendation is baseless in this case,

23   Your Honor.

24        The second point I'd like to address, as a preliminary

25   matter, is the claim that this is a political prosecution.

1    This defendant is not being prosecuted for his political

2    beliefs, period.  Had he simply attended the rally at

3    The Ellipse on January 6th, he would not be here.  Had he

4    simply recorded his views about this house being our house or

5    about making Congress think twice about what they are going to

6    do today, he would not be here.

7         He is here solely because of his decision to enter the

8    U.S. Capitol Building on January 6th and the consequences of

9    that action, plain and simple; and I will address those

10   consequences in detail in a moment.

11        But the third and final preliminary point I wanted to

12   make was to address the claims of selective prosecution or

13   disparate sentencing recommendations by the government when

14   compared to other protests, as noted by the defense.

15        So I'll address the issue of sentencing disparities as

16   part of my main presentation, but with regard to the defense's

17   attempt to compare this case to the Portland protests and the

18   Kavanaugh protests, as the Court may be aware, several other

19   defendants have raised similar arguments in court and, in fact,

20   have sought discovery regarding claims of selective

21   prosecution.

22        Both judges who reviewed those claims have rejected

23   them, Your Honor.  In the David Lee Judd case, Judge McFadden

24   considered the claim that the Portland protest was being

25   handled differently than the January 6th protests, and

1    Judge McFadden rejected that claim and the defendant's attempt

2    to show that the Portland defendants were similarly situated to

3    the January 6th defendant.

4         Likewise, in the Garret Miller case, Judge Nichols heard

5    the same argument, or similar argument, and found that the

6    differences were, quote, obvious and that while the Portland

7    rioters' conduct was serious, it did not target peaceful

8    transition of power at issue in the January 6th case.

9         Now, likewise, attempts to compare January 6th to

10   protests related to the confirmation hearing of

11   Justice Kavanaugh failed.  With regard to the Justice Kavanaugh

12   hearings, the Capitol was open to the public in 2018 when he

13   was being confirmed.  It was not open to the public on

14   January 6th.  The individuals in the Capitol Building during

15   the -- the protest that day stood in line for tickets to attend

16   the confirmation hearing and passed through security

17   screenings.  There was no unlawful entry to the building.

18   There were no reports of property damage or reports of law

19   enforcement being assaulted.  And, simply, the Kavanaugh

20   protesters were not part of a violent mob that laid siege to

21   the Capitol and shut down an official proceeding for hours.

22        As the Court is undoubtedly aware, multiple decisions

23   from this jurisdiction have called out the unique and

24   singularly chilling nature of the breach of the Capitol on

25   January 6th.  And the truth is, the events of that day do defy

1    comparison; and for that reason, the government submits that

2    claims of selective prosecution or attempts to compare the

3    disposition of this case to the disposition of cases related to

4    those protests are unwarranted.

5          But now I'll turn to what I believe should be the true

6    focus of the Court's sentencing consideration today, which is

7    the 3553(a) factors.  And I will highlight four of those

8    factors for the Court's consideration:  the nature and

9    circumstances of the offense; the history and characteristics

10   of the defendant; the need for general and specific deterrence;

11   and the issue of sentencing disparities, that I know is one

12   that is on the Court's mind.

13         So to begin with regard to the nature and circumstance

14   of the offense, we understand that the defendant has repeatedly

15   called for in sentencing pleadings that the Court should focus

16   on what he saw and what he did that day.  And to a large

17   extent, the government agrees with that.

18         So to talk about what the defendant did and what the

19   defendant saw, here's what we know:  We know that the defendant

20   visited the Capitol grounds the night before January 6th and

21   that he saw that it was completely closed to the public.  We

22   know that the defendant took a video that day that captured the

23   Capitol grounds, showing the fencing all around it with the

24   signs stating that it was closed to the public.  We know that

25   the defendant commented about the certification of election

1    results and about the fact that former Vice President Pence

2    would be at the Capitol that day.  And so we know that he

3    understood what was happening there that day.

4         We also know that as he approached the building on

5    January 6th, he saw a downed barricade, the barricade that

6    still bore the sign closed to the public, and we know that he

7    thought it was noteworthy enough to take a picture of it

8    because we found a picture of that downed barricade on his

9    phone.

10        We know that once on the grounds, the defendant watched

11   people scaling the walls of the Capitol.  And, again, it was

12   something he thought noteworthy enough to video.  And I would

13   add that the exhibit submitted to the Court reflecting that is

14   the complete video that was found on the defendant's phone.

15   Nothing was cut.  So it's not clear -- you know, the defense

16   say once those rioters breached the top of the wall, they waved

17   flags.  We don't have video either way of that.  All we have is

18   what was submitted to the Court in that regard.

19        We also know that as the defendant approached the

20   building, he saw a line of officers guarding the outside of the

21   building.  Again, that is a video that was submitted to the

22   Court in its entirety based on what was found from the

23   defendant's media.  None of those officers greeted him.  None

24   of those officers beckoned him in.  They were standing guard

25   trying to protect the building and its lawful occupants that

1    day.

2         We also know that as he entered the building, he walked

3    through a door that had been severely damaged.  There was glass

4    on the floor.  And we know from a video, not taken by the

5    defendant but taken by somebody else, that after he was there,

6    about 20 to 30 minutes after, that there were -- that video

7    gave you a sense of the sounds that were present that day,

8    including a persistent blaring alarm that was going off in the

9    building, and particularly in the area of the Senate wing door

10   that he entered.

11        Now, I want to make clear, the government does not have

12   video with sound for the exact time that the defendant entered,

13   and so I cannot provide that to the Court.  And I cannot

14   confirm with a hundred percent certainty that those are the

15   sounds that the defendant heard.  But I can say that the

16   government has reviewed video from both before and after that

17   time period in which the alarm was, in fact, constantly

18   blaring, and so we believe it to have been the case when the

19   defendant entered.

20        We know as well that the defendant did not go through a

21   metal detector or any security checkpoint when he entered the

22   building.  Now, in his sentencing memo, it states that while

23   Mr. Stepakoff was inside the Capitol hallway, there was no

24   sign -- or sorry -- there was no violence or destruction in his

25   purview.  But he literally walked through a door that had been

1     forced open in which the panes of glass had been shattered.

2           As Your Honor has seen from the videos submitted of the

3     entire time that he was in the building, which was about 5 or

4     6 minutes, we know that he stood within 1 to 2 feet of a

5     knocked-down piece of furniture in the middle of that entryway.

6     We know that people were climbing through the windows on either

7     side of him.  There were indications all around that the scene

8     was dangerous and that Mr. Stepakoff should not have been

9     there, but he went in anyway.

10          Moreover, others before him and after him have been

11    noted on other videos noting the smell of tear gas in the air,

12    both inside and outside of the building, and can be seen

13    flushing their eyes all throughout the west terrace area that

14    leads to the Senate wing door.  So while it is correct that no

15    officers blocked his path to entry, there were clear signs of

16    violent entry.

17          And the government can find no support that the

18    defendant has claimed that officers welcomed him inside or

19    ushered him in.  No officers shook his hand as he entered.

20    There was, indeed, an officer who was seen shaking several

21    people's hands in the video that was submitted, and I think

22    both the government and the defense submitted the same

23    5-minute video of the Capitol CCTV.

24          What you can see from that video is that the officer

25    appears to be trying to keep the peace and avoid escalation.

1     He is not approaching people to shake hands.  But when people

2     approach him to shake hands, he is accepting that.  And for the

3     most part, it appears that he's shaking hands as people are

4     walking out, which, of course, the Capitol Police were trying

5     to encourage.  And we can see that Mr. Stepakoff shook the hand

6     of a Capitol police officer as he exited.  So that couldn't

7     have been something that he relied on to believe that he was

8     allowed inside.  That happened on the way out.

9          We also know that some of the things that the defendant

10    said about the riot afterward were not honest.  And I'm not

11    talking about things that he didn't know at the time and

12    learned later.  I'm talking about things that he did know.  So,

13    for instance, the FBI interviewed one individual who the

14    defendant spoke to later that night.  The defendant told that

15    person that the Capitol Police had opened the main doors for

16    him and others and that they welcomed them into the Capitol

17    Building.  But the defendant did not enter through the

18    visitors' center or any other main door, and we have not

19    located any video showing law enforcement welcoming him inside.

20         The defendant also texted his mother-in-law that, quote,

21    things got out of hand when they brought in a busload of

22    Antifa.  But later in his interview with the FBI, he

23    acknowledged that this was something he had actually just read

24    about on Twitter and other news outlets, not something he had

25    seen.  So he perpetuated what he knew to be false narratives

1    about the Capitol Police opening the main door and welcoming

2    people in after the fact.

3         And I think this is all very important context,

4    particularly with regard to what the defendant has represented

5    about what he knew and what he understood that day.  Of course,

6    we can't see through his eyes, and we can't know what's in his

7    head.  All we can do is look for the evidence of what was

8    happening around him.

9         And the government agrees that every defendant should be

10   and is being looked at according to his or her own specific

11   facts and circumstances.  This is part of what makes the

12   question of avoiding unwarranted sentencing disparities both

13   very important but also very challenging because not one of

14   these defendants is identical.

15        Here the defendant is not being charged with some of the

16   more serious conduct of other defendants who were there on

17   January 6th.  He is only charged with misdemeanors, and that is

18   commensurate with his conduct.  The sentence that the

19   government is seeking, 14 days in prison, plus probation, is

20   directly proportionate to the conduct of this defendant and the

21   circumstances in which he was there.

22        And so I'd like to turn to the defendant's history and

23   characteristics.  It's absolutely correct that the defendant

24   has no criminal history, and it's to his credit that he has

25   been gainfully employed and appears to have helped provide for

1    his family for most or all of his adult life.  The -- these are

2    positive attributes, without a doubt, and he should be

3    commended for these things, and the government has taken that

4    into consideration in its sentencing recommendation.

5         But a review of the defendant's history and

6    characteristics is not just about criminal history.  As the

7    Court is aware, the defendant is a lawyer.  Now, whether he can

8    be called a lawyer or former lawyer based on his current

9    status, frankly, I'm not clear and I don't want to misrepresent

10   that.  What I can say is that Mr. Stepakoff absolutely

11   practiced law in the state of Florida for approximately

12   16 years, including 10 years of which as a criminal defense

13   lawyer.

14        And the point of this isn't to suggest that he would

15   have necessarily studied federal misdemeanor code to know what

16   statute we're here about today, but the point is that his

17   lawyers were called upon all the time to evaluate situations

18   based on our judgment and understanding of the legal framework

19   at large.  Not to mention that as a lawyer, he's presumably

20   been in at least one or two courtrooms in other government

21   buildings since 9/11, and some form of security is essentially

22   always required to enter a government building, let alone the

23   U.S. Capitol Building on a day that the joint session of

24   Congress was meeting.

25        So the idea that the defendant believed that he could

1    enter that building without walking through a metal detector or

2    other security under the conditions around him that day, I

3    think, at the very least, shows some very poor judgment.

4         Now, I do want to address very briefly the issue of the

5    defendant's suspension from the practice of law.  And I don't

6    want to belabor that point, but it is obvious that it is not

7    every day that you have a defendant who has admitted to acts of

8    dishonesty in a consent judgment, and that is what we have

9    here.  And because so much of the defense's argument is based

10   on very specific assertions by the defendant about what he saw

11   and what he understood, his credibility is at issue here.  And

12   I'll leave that there unless the Court has any further

13   questions about that matter.

14        The third factor that I'd like to focus on for 3553(a)

15   considerations is the need for deterrence, both general and

16   specific, and I think that both are important in this case.

17   With regard to general deterrence, what we are talking about is

18   deterring the next discontented group who's storming the

19   Capitol next time when, for example, we certify the results of

20   our next election or when Congress is making a decision that

21   certain people disagree with.  We promote general deterrence by

22   imposing consequences.  Consequences are essential.  They

23   discourage future criminal behavior.  And general deterrence is

24   especially important here where the crime is so public and so

25   widely known and closely followed, as the defense has pointed

1    out.

2         The defense makes a somewhat puzzling argument that the

3    government's, quote, unyielding prosecution of all defendants

4    is precisely what has a general deterrent effect in this case

5    but then argues that the defendant need only receive a $50 fine

6    for his offense.  This is a contradiction.  General deterrence

7    and the unyielding prosecution of all defendants, we submit,

8    requires that the participants in the Capitol riot be held

9    fully accountable by having real consequences for their

10   actions.

11        With regard to specific deterrence, here I would focus

12   very carefully on the statements in the defense's sentencing

13   memorandum to get a window into how the defense views the

14   severity of the defendant's conduct.  Throughout those filings,

15   the defense characterizes the defendant as a mere, quote,

16   peaceful protester.  And he characterizes the Capitol breach by

17   saying that January 6th was, quote, a political rally that got

18   out of hand.  Frankly, and with due respect, that is an insult

19   to the hundred law enforcement officers who were injured that

20   day in the line of duty defending the building and its

21   occupants.

22        And I think the fact that he continues to downplay the

23   seriousness of the events of January 6th -- and I mean the

24   events overall.  I'm not talking about whether he personally

25   participated in violent conduct -- the events overall in the

1    mob of which he joined is a factor for the Court to consider in

2    specific deterrence.

3         Another point raised by the defense is that the

4    defendant cannot be reprimanded for something he did not see.

5    That's a bit of a platitude, and it's not really accurate when

6    it comes to how the law works.  It's like saying that a

7    hit-and-run defendant can say it's not his fault because he

8    didn't see the person in front of him; or a drug mule can say

9    since he never looked in the bag, he can't be punished.

10        The defendant can and should be punished for his actions

11   and the consequences of those actions.  And that is really why

12   specific deterrence is needed here, because it's not okay, in

13   his words, to just follow the crowd when the crowd is

14   committing a crime.  And it's also not okay to just pay

15   attention to what's literally in front of your face -- or I'm

16   sorry -- to not pay attention to what's literally in front of

17   your face just because that's not what you're focused on.  It's

18   remarkable that the defendant is able to call out handshakes by

19   officers that were happening at the opposite end of the room

20   from him but insists that he didn't see broken glass and broken

21   furniture.

22        It's because we have to hold people accountable for the

23   consequences of their choices and their actions that the

24   government submits that specific deterrence is very important

25   in this case.  Every single person who was present without

1    authority in the Capitol on January 6th contributed to the

2    chaos of that day and to the danger posed to law enforcement

3    and to the civilians who were inside the building and to the

4    peaceful transfer of power.

5           And I know that the defense wants to break down step by

6    step the words, the steps, and the conduct of Mr. Stepakoff and

7    say surely one man didn't have that effect, one man didn't

8    contribute to the chaos, one man didn't contribute to the

9    danger.  But if we carry that argument to its extension,

10   virtually everyone who was there that day could say that.  Now,

11   obviously, the violent protesters who fought with law

12   enforcement are in a different category and have been charged

13   in a different category.

14          But the events of January 6th still, I believe, could

15   not have taken place the way they did without the nonviolent

16   protesters and the presence of people like Mr. Stepakoff

17   contributing to the crowd and the mob that day.  And this, I

18   submit, is a fact that the defendant refuses to acknowledge to

19   this day; and that is why the government believes that a

20   sentence of incarceration is important, and that the government

21   does raise some questions about the degree of the defendant's

22   remorse for his actions.

23          The final factor that I'd like to discuss today is the

24   issue of sentencing disparities.  The government will be the

25   first to acknowledge that sentencing is not an exact science

1    and that no defendant can be boiled down to a mathematical

2    formula.  I will say, however, that the government has made a

3    great effort to analyze the specifics of each defendant's

4    actions and history and characteristics and other relevant

5    3553(a) factors in determining its recommendations and has been

6    commended by some other judges for its work to make consistent

7    recommendations.

8         But mathematical precision is not possible; and, at a

9    minimum, we know that different individuals, be they judges,

10   prosecutors, or the public, will give different weight to the

11   different 3553(a) factors.  And it's also very difficult to

12   review some of those factors that go into an ultimate sentence

13   by reading a cold case for the record because, of course, the

14   genuineness or lack thereof of a defendant's address to the

15   Court may be lost on a transcript.

16        Likewise, the impact of the victim statement or of a

17   family's words who are present to speak on behalf of the

18   defendant may not fully come across.  And for these reasons,

19   while we have attempted to review this case in the context of

20   others already sentenced, we continue to believe that the

21   primary focus for the Court should be on the conduct of this

22   defendant and the specifics of his case.

23        For comparison, the government did identify two

24   relatively similar cases that are discussed in the government's

25   sentencing memorandum, the *Mazzocco* case and the *Pham* case.

1    Those are both cases where the defendant had no criminal

2    history, records of gainful employment, and relatively brief

3    periods inside the Capitol, though longer than this defendant.

4    One was inside for 12 minutes.  One was inside for 20 minutes.

5    They had some different nuances to their cases, which are

6    discussed in that sentencing memorandum, but the government

7    believes that the recommendation it makes today is well in line

8    with cases like those.

9         The defense has raised two cases that it submits for

10   comparison to the Court, and the government believes neither of

11   those is a good comparison.  In the *Doyle* case, it is true that

12   the defendant climbed through the window instead of the door

13   and spent 24 minutes inside the building, but there are some

14   important distinctions in the *Doyle* case.  Primarily, the

15   defendant claimed that she actually stopped another rioter from

16   damaging property.  The government didn't have evidence of that

17   one way or the other, but if that's the case, that would be

18   viewed as a mitigating factor.

19        That defendant had no social media posts glorifying the

20   events of January 6th and, significantly, the Court noted a

21   very -- a very sincere showing of remorse and found the

22   defendant appeared to be truly sorry for her role in the

23   actions of January 6th.  And Ms. Doyle, of course, was also not

24   a former attorney.  All of those, we believe, are distinctions

25   that prevent that case from being a good comparator to the case

1    at hand.

2         The second case raised by the defense is the Rosa case.

3    That was a defendant who spent 15 minutes inside the building.

4    And, again, that defendant had no criminal history and was

5    gainfully employed.  There's a very important distinction in

6    that case; and, that is, that on January 9th, three days after

7    the protest, that defendant made the voluntary decision to walk

8    into his local FBI office to confess and accept responsibility.

9    There had not been any arrest warrant obtained in his case.

10   Contacted the FBI on his own.  And that is a dramatic

11   distinction from this case where we know that the FBI had

12   contacted an individual to begin its investigation of

13   Mr. Stepakoff, and that individual reached out on two occasions

14   to Mr. Stepakoff to let him know that the FBI was investigating

15   him.  Mr. Stepakoff did not come forward at that time.  He did

16   not speak to law enforcement at that time.  He ultimately was

17   arrested by the FBI.  And it was not until a negotiated

18   condition of his plea required that he speak to the FBI that he

19   did so.

20        And so to sum all of this up, I think Your Honor has

21   previously noted that the riot was successful in delaying the

22   certification in large part because of the number of

23   participants involved, which simply overwhelmed and outnumbered

24   the law enforcement present.  So regardless of the defendant's

25   intentions, he contributed to those numbers and has to be held

1    accountable for his actions.

2          For those reasons, the government believes that a

3    sentence of 14 days of incarceration and 3 years of probation,

4    in addition to 60 hours of community service is warranted and

5    not more severe than necessary.

6          Thank you, Your Honor.

7          THE COURT:  Okay.  I have a couple questions for you.

8    One is, obviously, as you reference in your footnote about the

9    difference between consecutive incarceration and intermittent,

10   that COVID is a serious problem in -- in correctional

11   institutions these days.  Why would it make any sense to send a

12   nonviolent defendant into a correctional institution in the

13   middle of this COVID emergency?  You want to give me your

14   thoughts on that?

15         MS. PROUT:  Yes, Your Honor.  And I appreciate the

16   Court's concern about COVID.

17         What I would say to that is that of course federal

18   courts have continued to sentence defendants to custody

19   throughout the pandemic.  Given the report time typically seen

20   for sentencings, we're likely to be several months out from

21   where we are, and certainly there are reports that the Omicron

22   surge is going to be substantially reduced by then.  But I

23   think what's important is that now that vaccines are available,

24   the risk is greatly reduced from what it was.  And at the same

25   time, the need for deterrence and a just sentence does remain

1    as high as ever.  And so we do believe that the concerns about

2    the need for deterrence and/or just sentence outweigh the

3    concerns of the pandemic, Your Honor.

4            THE COURT:  And the other question I have for you,

5    you indicated you read my questions in the other -- the one --

6    only the one other January 6th case which I have sentenced.

7    And, you know, one of the things I asked there was the

8    government has recommended home confinement in a number of

9    cases.

10           And, you know, your black-and-white chart doesn't make

11   it easy to compare and contrast in any substantive way.  But

12   one of the things I asked that prosecutor was, you know, why

13   are you asking for incarceration.  And what they said is, well,

14   one of the things we consider is what the person did while they

15   were in the Capitol.  And this defendant -- meaning the

16   defendant in that case -- spent time in a private office of one

17   of the Congress people, and we considered that as an

18   aggravating factor.

19           Well, that's not present here.  So I don't see any way

20   of distinguishing the cases in which the government has asked

21   for home confinement.

22           MS. PROUT:  I understand the Court's question.  And

23   because of the vast number of sentencings and cases that

24   we've -- that have come through the courts at this point, it is

25   very difficult to come up with a way to sort of encapsulate all

1    of that information.

2         What I would say is the government's approach here is to

3    look at each defendant very specifically from a lens of what

4    are mitigating factors and what are aggravating factors and

5    what falls somewhere in between.  Mitigating factors, as I

6    mentioned, would be attempts to stop violence that day.  A

7    mitigating factor could be, like, the case I mentioned of a

8    defendant who self-reports to law enforcement without being

9    under investigation or a defendant who expresses extraordinary

10   remorse.  Those are some of the mitigating factors.

11        Aggravating factors, the government has outlined a

12   number of potential aggravating factors in its sentencing

13   memorandum, including things like the length of time in the

14   building, which, of course, in this case would not be

15   aggravating.  Visiting sensitive spaces; again, not one of the

16   aggravating factors in this case.  In this case what the

17   government sees as aggravating factors is really the

18   combination of the defendant's background as a lawyer, and

19   specifically a criminal lawyer, someone who absolutely should

20   have known better than to be there that day, combined with the

21   defendant's, in the government's view, very nuanced and shaded

22   expression of remorse.

23        The government has some real concerns about whether the

24   defendant is acknowledging the role that his presence played in

25   the Capitol that day.  And those are the aggravating factors

1    that we believe take this into the category of incarceration.

2    And, of course, we are asking for essentially the very lowest

3    amount of incarceration, more or less, that would even qualify

4    as incarceration.  But we believe that those aggravating

5    factors do tip the scale in favor of the government's request

6    for incarceration here.

7            THE COURT:  All right.  Thank you.

8        Ms. Medvin.

9            MS. MEDVIN:  Yes, Judge.

10           I'll start with the government's oral argument in terms

11   of responses, and then I'll work -- I'll make my way towards

12   the arguments we've already laid out in the pleadings and just

13   elucidate some of the points.

14           First of all, the government -- I'll -- I'll start

15   actually towards the end.  The government was making

16   comparisons between Mr. Stepakoff's case and that of Mr. Rosa,

17   for example.  One of the issues with that case being compared

18   to other misdemeanor cases was brought up at the Rosa

19   sentencing.  And the government at that sentencing told the

20   Court that the reason he was getting a lenient sentence and a

21   lenient plea offer is because he receives credit for coming to

22   the FBI.  He was originally charged with a felony offense.  And

23   that felony offense was then reduced to a misdemeanor.

24           And what the government explained to the judge in that

25   case was it was reduced to a misdemeanor because, in fact, in

1      that case the defendant came to the FBI.  But then they still

2      requested incarceration.  I believe it was 30 days in that

3      case.  And so it's not accurate to say that the reason he

4      received a lenient sentence was because he went to the FBI.

5      They still requested a high sentence in that case.  But in --

6      and that's -- that's because that case started out as a felony.

7          In this case, the main comparison would be to

8      Ms. Danielle Doyle.  She started out with misdemeanors and so

9      did Mr. Stepakoff.  And her final plea offer was the same type

10     as Mr. Stepakoff received, except the difference is she went

11     through a window, certainly not an entrance that's known to the

12     general public as an entrance.  Mr. Stepakoff walked through

13     open doors.  And this is an important point and why the defense

14     keeps deferring to the video of this case, the government

15     security footage, is because actually watching as opposed to

16     having the government explain, well, you know, something

17     happened to the left, something happened to the right,

18     something happened 20 minutes before, something happened

19     20 minutes after.

20         But putting on horse blinders and observing the moment

21     that Mr. Stepakoff observed when he walked in, from his

22     perspective, that's what's relevant here.  And we would like to

23     play for the Court Government's/Defense Exhibit A, if we can do

24     so digitally.  Or if the Court has seen it, we can submit on

25     that.

1          THE COURT:  I have seen all the exhibits that --

2          MS. MEDVIN:  Thank you, Judge.

3          THE COURT:  -- both sides have submitted.

4          MS. MEDVIN:  The video clearly shows two doors that

5     are wide open, and the entrance is wide enough for multiple

6     people to pass through at the same time.  There's no one

7     blocking.  There's no officer standing to the side of the

8     entrance.  It's just a large crowd coming in and out.  The

9     crowd is walking in slowly and peacefully.  They're waving

10    flags.  The individuals in the crowd are not committing

11    violence.  The individuals around Mr. Stepakoff in that moment

12    when he walked in were peaceful individuals.  They were

13    peaceful protesters.

14         Now, were they committing an offense while protesting?

15    Yes, that's a misdemeanor offense that they committed while

16    protesting by entering that building, by protesting inside the

17    Capitol.  It's a locational violation.  But in terms of their

18    conduct, they were, nonetheless, peaceful.  They were not

19    harming anyone.  And, indeed, on the video defense counsel is

20    able to count seven defendants who were -- seven individuals

21    inside the Capitol who shook hands with an officer.  Some of

22    them were shaking as they were walking out.  Others were to the

23    side of the video, to the right, which is inside the Capitol

24    hallway.

25         That officer wasn't standing initially near the door.

1    He was standing in the middle of the hallway before walking

2    towards him, shaking hands, speaking to him, and that is the

3    environment around.  The officers weren't pushing anyone out.

4    No one was fighting.  No one was toppling any statues.  None of

5    that was taking place.

6         Mr. Stepakoff, for a good portion of the video, was

7    actually looking at his phone.  He wasn't talking on his phone.

8    He was looking at his phone.  And he was standing near the

9    entrance, and then he walked out after shaking hands with an

10   officer.  And so from that perspective, what he observed in

11   that area in that moment he was in the building is not what the

12   government is describing.

13        And this is where the defense made a point.  We make

14   this point a few times in our pleadings; where the government

15   is using evidence from other cases to create this exceptional

16   story of what Mr. Stepakoff would have been part of, but it

17   wasn't there.  Now, after the fact, playing Monday morning

18   quarterback, and we're seeing a bird's-eye view -- because

19   that's one of the exhibits that the government has submitted --

20   a bird's-eye view of the event from above, seeing a very large

21   crowd and seeing in some other portions, there's violent acts

22   taking place.

23        That's not what Mr. Stepakoff saw that day.  That's not

24   what he was exposed to.  And the government says, okay, well,

25   there's people scaling a wall.  And as we say, well, yes, and,

1    after the fact, they waved flags.  The government says, well,

2    we didn't see that on Mr. Stepakoff's video.

3        Well, the government has the defendants who were waving

4    flags actually facing charges.  And they have other videos of

5    it that they submitted to the defense in discovery.  We have

6    all the discovery.  We have videos of individuals, as they

7    call, scaling the wall, climbing up the wall, to wave flags as

8    they get up there.  And so the government says, well, because

9    they scaled up a wall, then they waved flags, which they claim

10   they don't know the flags were waved, but they do because they

11   provided us with those videos.  And surely they're exposed to

12   the same videos on YouTube that they provide in pleadings as

13   well that we can see.

14       But the individuals waving flags are not, quote/unquote,

15   dangerous to the point where the defendant should at this point

16   realize that he should not be going inside, or whatever the

17   government is trying to make an argument of.  It just doesn't

18   quite make sense.  It doesn't carry water.

19       The government is fully aware that individuals involved

20   in protests are surrounded by some individuals that will take

21   part in civil disobedience.  That happens in every protest.

22   There's civil disobedience that the government knows full well

23   about that takes place in every known protest in

24   Washington, D.C.  There's always police out for this reason;

25   that someone will disobey the law and someone will be arrested.

1   And that happened here.  That happened in the Kavanaugh

2   hearings.  People get arrested, and it's just a degree of

3   conduct.

4         In this particular case, with this defendant and what he

5   saw, he wasn't at this point thinking, oh, well, this is a

6   dangerous scenario because somebody's waving a flag at the top

7   of the Capitol Building.  He's paying attention to what's

8   around here.  And the Court has to take acknowledgment of the

9   fact that he's in a very loud crowd, and he's one individual in

10  a very loud crowd.  He can only know so much of what's going

11  around him.

12        And, again, all the images that there -- the government

13  has taken from his phone that we have shown to the Court in our

14  pleadings as well show older individuals, families protesting.

15  They have Trump memorabilia.  They don't have weapons.  Their

16  faces aren't hidden.

17        One of the points we make to the Court is a man is not

18  covering his face and shaking hands with a police officer, this

19  is not a man who thinks he's committing an offense.  He doesn't

20  have his face covered.  He is not trying to run.  He's not

21  wearing black clothing to match other individuals with whom he

22  walked in because they're trying to commit an offense and not

23  be identified.  No.  His face is wide open, and he's shaking

24  hands with officers because he doesn't realize that he is

25  committing an offense.

1          And the government says, well, he's a lawyer or was a

2     lawyer and for that reason he must have known that this is

3     unlawful.  Mr. Stepakoff practiced criminal law 22 years ago

4     locally in Florida, defending indigent defendants under the

5     Florida code.  He knows nothing about the Capitol Building or

6     its rules; and, quite honestly, as Mr. Stepakoff advised them,

7     he was not aware that it's unlawful to protest in the Capitol,

8     actually pointing at other instances when saw individuals

9     protesting in the Capitol.  He didn't realize that going inside

10    the Capitol Building without doing anything was unlawful.

11         He knew, for example, a Senate proceeding interruption

12    would be unlawful, having walked inside and done what the

13    Kavanaugh protesters have done.  As we mentioned in our

14    pleadings, those were in the Senate hearing.  The Senate

15    proceedings were taking place.  And in that chamber,

16    individuals stood up and disturbed the Senate proceedings.

17    That's when they were arrested.  They actually disturbed the

18    proceedings.

19         Mr. Stepakoff was in a hallway which on other occasions

20    does open to the public.  There are tourists at the Capitol.

21    Some of the images provided to the defense for global discovery

22    show defendants walking through red velvet ropes like tourists

23    would.  The environment in that particular moment when the

24    defendant entered is a very different environment than the one

25    painted by the government because, yes, there are things going

1    around, but that's not what Mr. Stepakoff was taking part of or

2    seeing.

3         At the end of the day, he's still an individual who

4    didn't come with a group.  He didn't come prepared.  And this

5    is not an individual who's behaving as if he's attempting to

6    commit a crime or realizes even that he's committing a crime.

7    The government wants him to be more omniscient; he needs to

8    realize what's going on around him.

9         There were some individuals coming through windows.  He

10   doesn't make eye contact with those individuals.  And we can

11   see as he enters, he's not looking to his right, which is where

12   he would have seen the individuals entering, or to his left.

13   He didn't do that.  He's kind of looking around, and he's

14   aloof, and he's incognizant.  He's paying attention to his

15   phone.  And he's slowly -- or, kind of, in his own world.  This

16   is not a defendant that's highly aware of his surroundings.

17   Should he have been?  Maybe.  But that's not his personality.

18   At the end of the day, he is who he was born as, and that's his

19   personality.  And he keeps to himself, and he's more aloof than

20   other people.  And it is what it is.

21        The government wants him to be more aware.  There's a

22   statue that was, apparently, knocked down.  And, quite

23   honestly, it took counsel quite a bit of time to realize what

24   the government was talking about.  But that statue that was

25   knocked down, they're saying, well, he walked past it.  There

1    were other individuals between him and the statue as he walked

2    past.  There was a line of other defendants walking past

3    between Mr. Stepakoff and the statue.  It wasn't adjacent to

4    it.  There was people in between him and that object, whatever

5    it was, on the ground.

6         And even still, I'm not sure that if we see a birds-eye

7    perspective, we see from above, in -- that camera, I don't know

8    what the perspective would have been of someone on the ground

9    at eye level with that object.  I'm not sure that it would have

10   been visible.  I just know that in the video that the

11   government is referencing, the object is visible from above.

12        As far as the government saying, well, we can't trust

13   the statements.  It's a veracity issue.  We can't trust it

14   because -- and they point to two things.  Today they mentioned,

15   well, apparently, Mr. Stepakoff spoke to an individual -- who,

16   by the way, the government did not provide a full name to the

17   defense so we have no ability to actually cross-examine the

18   statement.  The government says, well, a statement was

19   made [sic] to that individual.  Well, that individual is not

20   here today for the ability of the defendant to cross-examine

21   the statement.  So we can't rely on it.

22        The name of that individual was never provided to the

23   defense.  They provided initials.  And so that statement is

24   just simply an unreliable statement even under the rules of

25   sentencing.  So even though we have lower standards for

1     admissibility, it's simply unreliable.  We don't know who the

2     individual is.  We don't know if he remembers correctly.  We

3     don't know if he has any kind of incentives to fabricate or

4     change.  We know nothing about this.  We have the government

5     telling us someone said something and we're going to accept

6     that as truth, and that's just simply unreliable.

7          And the second issue is the defendant's veracity based

8     on a 20-year-old disciplinary issue.  Now, we submit to the

9     Court that we have never seen the defense -- a career criminal

10    defense attorney, Judge -- over 10 years of practice, I've

11    never seen anything like this where the government will seek

12    out a defendant's 20-year-old bar disciplinary paperwork and

13    try to say that, well, because 20 years ago something happened

14    and we think we can be -- characterized as dishonest, because

15    that's one of the words in the title of his sentence, that

16    that -- or his suspension, that that means the defendant today

17    is unreliable, even though all of the video evidence

18    corroborates what he says.  The video evidence simply

19    corroborates that.

20         We don't have any reason not to believe him.  The

21    government decided that the state bar of Florida, which only

22    looks at the past ten years of disciplinary history, must be

23    wrong.  And so the Florida state bar only looks at ten years

24    and says, well, it didn't happen in the past ten years.  It's

25    not even important enough to notify the public.  And so we

1    submitted to the Court imagery from the Florida state bar

2    public website what they show the public as far as practicing

3    attorneys and what the bar believes is relevant for the public

4    to know about practicing counsel who they can trust.

5        Mr. Stepakoff isn't even practicing law.  Mr. Stepakoff

6    hasn't practiced law in 20 years -- or in 16 years at this

7    point.  And he's -- he hasn't sought to renew his license, and

8    the reason why, as the government is fully aware, that's

9    because he is a practicing rabbi.  Mr. Stepakoff has been a

10   rabbi for well over 20 years.  He was initially doing both

11   rabbinical work and practicing law, and then he stopped

12   practicing law altogether in 2006.

13       And since that time, for 16 years, he's been doing

14   exclusively rabbinical work.  That is all he has been doing.

15   He's a full-time rabbi.  That is his calling.  That is all he's

16   been doing.  He has been a man of God for 16 years.  The

17   government is fully aware of that.

18       But the government wants to ask for this excessive

19   sentence, and so they're bending over backwards to find

20   information on him.  As we call -- this is an attempted

21   character assassination of Mr. Stepakoff, trying to find some

22   dirt on him, something to try and justify this absolutely

23   exceptional sentence that they're seeking in this case, and it

24   doesn't make any sense.  And that's why we say the government

25   is bending over backwards to find this information.

1    You know, we cannot rely on 20-year-old bar disciplinary

2    records as a reason to believe or not believe someone when the

3    evidence in front of us clearly shows that we should believe

4    him; and certainly the evidence they're relying on is so old

5    that even the state bar of Florida is not relying on it.  And

6    so we don't think the Court should consider that in its

7    veracity considerations.

8    But in this case, the video evidence -- the primary

9    video evidence of Mr. Stepakoff does not show a man who's aware

10   he's committing a crime.  And I cannot state that enough.  The

11   imagery from that video is fairly clear.  He is an aloof man

12   who doesn't belong.  He clearly -- he has no idea what is going

13   on or what he's doing, walking around pointlessly and walking

14   out.

15   And the government says, well, there's an Antifa sticker

16   or something -- anti-Antifa sticker on the door that they

17   submitted a photo of and there's a broken window.  And they

18   say, well, it's not something Mr. Stepakoff may have or may not

19   have seen.  We're just trying to show that that's what it would

20   have looked like.  How is that relevant, Judge?  This image was

21   taken 20 to 30 minutes after Mr. Stepakoff walked through a

22   door, and this is an image of a window.  What does that have to

23   do with anything?

24   And this is where the government is reaching.  They're

25   reaching to other people's cases to try and come up with

1    evidence to use against this defendant when, in fact, this

2    sentencing, this defendant's, is supposed to be limited to his

3    conduct, to what he knew, to what he saw, not to what everyone

4    else was doing.  And the government says, well, the defense is

5    minimizing what everyone else was doing and that's why we're

6    adding this.

7         Well, the defense is responding to what the government

8    is doing.  So the defense is trying to reel reality back in

9    because the government has made some outlandish claims in these

10   cases.  They've stated that nothing worse has happened to the

11   Capitol; where indeed we know, well, yes, something did.  We

12   had a bombing at the Capitol.  We had double the value of

13   damage from that bomb.  The bombing was a deadly weapon.

14        None of that is present here.  These were individuals

15   who came in without weapons and who were protesting -- some

16   were fighting, but these were not individuals prepared for

17   attacking police officers or the Capitol -- individuals around

18   Mr. Stepakoff.  That just didn't happen.  They didn't have

19   weapons.  They didn't throw bombs.  They -- no one was shooting

20   anyone.  None of that was taking place.

21        So the government says, well, just because some --

22   somewhere else something violent happened -- there may have

23   been a fire extinguisher.  There may have been something else

24   that's violent.  Police officers were injured from hand-to-hand

25   combat.  Some people were using tools, et cetera.  Again, that

1   wasn't happening around Mr. Stepakoff.  What was happening is a

2   protest that got out of hand around Mr. Stepakoff.  That's what

3   was happening there.

4       What happened elsewhere I'm not even going to comment on

5   as far as his case because it's not relevant to him.  An

6   individual in a crowd, whatever happens with that, is still

7   responsible for his actions and what he would have known about

8   the crowd.  So if an individual is taking part in a mob beating

9   because he's watching someone beat someone else up and he takes

10  part in that, that's different.

11      Here they were peacefully walking in and around.  We see

12  the protesters around Mr. Stepakoff, and those protesters are

13  calm.  Those protesters are nonviolent.  And those protesters

14  are peaceful.  And they're peacefully shaking hands.  You see

15  some of the protesters patting the chests and the back of the

16  officers, in addition to shaking their hands.  These are

17  individuals who are not out to harm anyone.  That's the scene

18  around Mr. Stepakoff.  That is a protest that got out of hand.

19  They shouldn't have gone inside, but that's where he was.

20  That's what the group around him was.  That's what he was

21  seeing.

22      The government does note that he took a photo of a fence

23  that was taken down.  We don't know the location of that, and

24  it wasn't -- it was quite a bit of time before he got to the

25  Capitol.  So in terms of the relevance of that, to where he was

1    in -- there's no connection there, other than it's somewhere in

2    D.C.

3           The government made a comment today that in -- on

4    January the 5th Mr. Stepakoff knew that the Capitol was closed

5    off.  Yes, on January the 5th, Mr. Stepakoff knew the Capitol

6    was closed off, but on January the 6th Mr. Capitol --

7    Mr. Stepakoff also went to President Trump's speech where

8    everyone was then told to go towards the Capitol.  And he, like

9    everyone else, did.  They all went towards the Capitol.  And

10   then once they got there, they were all trying to have their

11   voices heard.  You hear a lot of shouting and people screaming

12   and protest type of behavior.  That was -- that was happening

13   in front of the Capitol where Mr. Stepakoff was.  So none of

14   that was out of the ordinary in terms of what he was observing

15   prior to.

16          And then eventually the doors are open and the crowd

17   walks through, he follows them in.  That, for purposes of this

18   case, we'll say, yes, that was out of the ordinary.  Except for

19   Mr. Stepakoff, he's not used to protesting, certainly not in

20   D.C.  This was not something he was aware of.  Now he's very

21   much aware not to follow crowds.  He's certainly learned his

22   lesson.  He will not be following crowds.

23          I think that the government actually made a comment,

24   well, we don't know if we can trust Mr. Stepakoff now to make

25   this mistake again.  The government actually asked

1   Mr. Stepakoff at his FBI interview, "Are you going to go to the

2   protest scheduled in D.C. for" -- it was September or October.

3   There was a protest in D.C. in front of the Capitol, and he

4   said, "Absolutely not."  They said, "Would you recommend to

5   someone else to go to that protest?"  And he said, "No, I would

6   recommend people don't go to those protests."  That's what he

7   said.  That was their conversation.

8         And so for the government to have the audacity to say

9   that, oh, well, we don't know if he's going to commit other

10  such acts in terms of when he's taking part in protests, it

11  doesn't make any sense.  They literally tried to establish this

12  during his interview.  They were testing his, I guess, danger

13  in terms of these protests.  And he made it clear.  He's not

14  going anywhere.

15        He's a normal man, a man who has four grown children.

16  His oldest just went off to college.  I'm sorry.  His youngest

17  just went off to college.  This is a grown man who's being

18  arrested at age 56 who was -- has a search warrant executed on

19  his house for coming into the Capitol.  The government thinks

20  that, oh, this is a danger, that he's going to repeat.  Of

21  course not.

22        This is a man who had to take down posts because he was

23  so concerned about his congregation because he's a rabbi and he

24  leads people.  He was so concerned about the congregation and

25  their -- the political divisiveness.  That's why the posts were

1    taken off.  And that was a conversation the FBI had with

2    Mr. Stepakoff as well.  Why were these posts taken down?  He

3    explained.  I was told that it's really bad for the

4    congregation, people disagree politically, and I didn't want to

5    add to the division.  And so I took down my political posts

6    because I didn't want there to be so much division.  And they

7    have that conversation with Mr. Stepakoff.  Why were those

8    things taken down?

9         And so today we hear a lot of -- and also in the

10   pleadings -- the government trying to paint Mr. Stepakoff as an

11   uncertainty or someone dangerous, and none of that is accurate.

12   And the government had complete access to Mr. Stepakoff.  They

13   know everything they could possibly want to know.  They

14   executed search warrants on his cellular device and on his

15   computers.  Whatever it is that they wanted to find, they

16   looked for and they could not find.

17        So then they talked to him.  Whatever they wanted to

18   ask, I gave them complete access to ask whatever they wanted of

19   Mr. Stepakoff.  The government even started asking about future

20   protests, and normally I would have cut them off, but I let

21   them continue asking those questions because this man has

22   nothing to hide.  This [sic] is not a danger to society or to

23   the FBI or anyone else.

24        And so, again, reeling the story back in to where we

25   are, at the end of the day, this is a protester who walked into

1   the Capitol, albeit unlawfully, who stayed there for a period

2   of 5 minutes.  He looks on his phone.  He shook hands with a

3   police officer.  The people around him were peaceful.  The

4   people around him shook hands with officers, patted them on the

5   chest, and then he walked out.  And then he went back to his

6   hotel room.

7          And then when people were claiming, oh, well, there's

8   violence at the Capitol.  I mean, I didn't -- I didn't believe

9   that.  He didn't believe that it happened because that's not

10  what he saw.  He wasn't trying to spread false information,

11  which, by the way, still doesn't justify a criminal sentence of

12  jail time, even if that was the case.  But in this case, it was

13  clear he didn't see violence so he thought it was lies

14  perpetuated to make conservatives look bad.  Because he thought

15  there was -- I believe the story relayed was buses of Antifa or

16  someone else trying to pose as Trump supporters, and those were

17  the individuals who were committing these acts.

18         It had to be, because certainly in front of him no one

19  was committing the acts that he was hearing about on the news.

20  That's not what he saw for himself.  That's not spreading lies,

21  Judge.  That's spreading what he thought was the truth and an

22  explanation for what others were saying.  He's creating an

23  explanation for why it would have been the case.

24         In terms of the government's statement that, well, we're

25  comparing -- the defense is comparing the Kavanaugh protesters

1    and Portland protesters to Mr. Stepakoff and somehow that that

2    is a bad comparison, that's also inaccurate.  It's actually a

3    very good comparison.

4         And the government actually brought out a decision that

5    is on the record from Judge McFadden.  And the government made

6    it sound like, well, in that decision Judge McFadden said that

7    these are not a good comparison.  I'd like to read from that

8    decision, Judge, because it actually is very relevant.  The

9    judge writes, ". . . incredibly, the Government dismissed . . .

10   charges against all three Portland defendants," who, by the

11   way, Judge, were accused of violent acts against police

12   officers.

13        The judge writes, ". . . he" -- the defendant -- "still

14   faces greater charges than the Portland defendants, despite

15   [the] key difference[s]."  And this is suspicious, he writes.

16   He writes suspicious.  That's the word the judge used.  The

17   judge wrote, "That is the kind of 'different treatment'"

18   quote/unquote "that might warrant discovery."

19        "The Government responds that it treated Judd and the

20   three Portland defendants equitably because it filed felony

21   charges against all of them.  . . .  The Government seems to

22   think that the initial charges are all that matter, [but]

23   not" --

24             THE COURT REPORTER:  Ms. Medvin, you're going to have

25   to slow down if you're reading.  "The Government seems to think

1    the initial charges are all that matter, but . . ."

2         MS. MEDVIN:  "The Government seems to think that the

3    initial charges are all that matter.  Not so.  By that logic,

4    the Government could avoid discovery of a race-based selective

5    prosecution claim if it indicted similarly situated black and

6    white persons, dismissed the charges against the whites, and

7    prosecuted the black defendants to conviction or plea.  The

8    'administration of a criminal law' is not limited to an initial

9    charging decision.  Nor is it so easily circumvented."

10        Judge goes on to say, "More, the Government's logic

11   would allow it to charge similarly situated black defendants

12   with felonies and white defendants with misdemeanors.  But

13   discriminatory effects include disparities in the 'crimes

14   charged.'  The Government's argument is thus absurd and

15   untenable - that the Government originally indicted the

16   Portland defendants does not erase the potential for

17   discriminatory effect."

18        And later on, the judge concludes -- and we cited to

19   this decision in our sentencing memorandum.  The judge notes

20   that none of the suggested -- none of the -- "None of this

21   suggests that the distinctions" -- and at this point the judge

22   is referencing the distinctions he's made between Portland

23   cases and these cases -- "Judd highlights are irrelevant for

24   all purposes."  And he quotes another decision that he made in

25   another case, *United States v. Griffin*.  He says, "Disparate

1    charging decisions in similar circumstances may be relevant at

2    sentencing."

3         And, Your Honor, we are bringing up the discrepancy at

4    sentencing.  We did not file any other dismissal motions in

5    this case.  We're bringing up the disparity, where it belongs,

6    at sentencing.  Judge McFadden has stated twice on the record

7    that this belongs at sentencing, and that's where we brought

8    it, at sentencing.  And this is the standard that we're asking

9    for the Court to consider, sentencing disparity, not charging

10   disparity.  And that is why we put forward this argument.  So

11   the government's argument as far as charging decisions, it's

12   simply irrelevant because that is not what we have raised.

13        As far as the Portland cases, those cases are

14   tremendously different, obviously, than Mr. Stepakoff's case.

15   We had individuals who were attacking officers violently.

16   Officers suffered injury, and the government dismissed charges

17   against those individuals.  I believe more than half of the

18   individuals charged had their charges dismissed.  The

19   government made claims, well, it's hard to ascertain their

20   identify because certainly they're wearing black, they were

21   wearing matching uniforms, and their faces were covered.  And

22   so it's hard to ascertain identity.

23        But, of course, Judge McFadden pointed this out, as did

24   some defendants.  That didn't stop the government from finding

25   who they were and arresting them; therefore, not having an

1    identity issue.  So, indeed, someone with an identity that was

2    strong enough minimally for probable cause was arrested, and

3    then, of course, their charges were dismissed after the fact,

4    after they completed community service or some kind of other

5    dismissal program.

6          And a dismissal program, like that exists in the

7    District of Columbia, as the defense points out in our

8    pleadings, there is such a program of dismissal.  And the cases

9    are supposed to be considered on an individual basis.  But

10   Ms. Prout and other prosecutors have made it very clear that

11   the January 6th defendants shouldn't even worry about that,

12   that does not apply to them.

13         Their cases will not be considered individually even for

14   the dismissals program.  That will never simply apply to anyone

15   involved in the January 6th prosecution, so contradicting their

16   online website claim that they treat cases individually.

17   Because these individuals are not being treated as individuals.

18   They're being treated as members of a group of people who came

19   to the Capitol on January the 6th.  So irrespective of their

20   individual conduct, they need not apply for any kind of

21   dismissal disposition.

22         And we certainly submit to the Court that that is not

23   equitable and that that completely contradicts their policy

24   statement.  The government is treating these defendants

25   differently for purposes of sentencing because this is for

1      purposes of disposing of the offense.  It's a disposition

2      issue.

3            As far as the Kavanaugh protester that --

4      Ms. Steingraber that we've pointed to in our memorandum, her

5      conduct was significantly more serious than Mr. Stepakoff's.

6      She was inside the Senate Chamber, and she disrupted the

7      proceedings, which are also constitutionally mandated

8      proceedings in that case.  Different types.  But, nonetheless,

9      those were disrupted by her behavior.  And after the fact, she

10     boasted about it on the internet.

11           And the government says, well, the fact that the

12     defendants in the January 6th cases boast about something on

13     the internet or promote some kind of political ideology, that

14     that should matter for sentencing.  Well, it didn't matter that

15     this boasting was taking place in other cases.  This isn't the

16     first time a defendant went into the Capitol politically and

17     then posted something on the internet.  That happens all the

18     time.  That's in the age of the internet what people do.

19           And at the end of the day, her conduct is more serious

20     than Mr. Stepakoff's.  But her conduct was considered a type of

21     civil disobedience.  She was charged under D.C. local code, and

22     it was a post-and-forfeiture disposition where she posted $50

23     and the case gets dismissed.  It's not even an adjudication of

24     guilt.  So it's not even a criminal record for her.

25           With Mr. Stepakoff, and other defendants similarly

1    situated to Mr. Stepakoff, they were prosecuted by the federal

2    government; something that did not take place in any other kind

3    of Senate disruption scenario.  They received supervised

4    pretrial probation.  They were restricted from traveling.

5    Mr. Stepakoff's passport, for example, was taken from him.

6    They are restricted from possessing firearms, most of the

7    defendants in these cases.  They're treated very differently

8    than someone who just pays $50 and their case goes away without

9    a record.

10           Then, none of these cases were offered a dismissal

11   disposition.  These cases were offered at the lowest -- the

12   offense that Mr. Stepakoff pled to, which is the parading in

13   the Capitol offense, and there is a mirror offense of this

14   nature in the District of Columbia code, as we pointed out as

15   well.  That wasn't offered to the defendant.  Plead guilty but

16   under the District code.  No.  It was under the federal code so

17   they could get a federal sentencing, because they have a

18   harsher sentencing here in the federal court.  Because, as the

19   government noted, it's up to five years of probation as opposed

20   to dismissal with not even a criminal record.

21           And so here we are with very similar conduct.  And the

22   government explains, well, the reason why is because it's part

23   of January 6th.  Fine.  At this point, Mr. Stepakoff has

24   already pled to the offense.  He's already been on a year of

25   supervised probation pretrial.  He's already pled guilty.  So

1    he already has a criminal record.  These are punishments.  His

2    house was ransacked.  That's a punishment.

3           He was publicly ridiculed on the government's website

4    where they posted to -- all his documents.  They created a web

5    page with his name on it.  They have an actual web page with

6    Mr. Stepakoff's name on it in their website pages.  So he's --

7    their department may choose when to remove it, if ever.  And so

8    this is what we called public tar and feathering at this point.

9    Because why do we have that in these cases; right?  It's never

10   been done before.

11          So the government is treating them all very differently,

12   and they're causing severe societal implications.  You know,

13   everything from the conviction to the one year of supervised

14   release, pretrial probation, to these -- these websites, to how

15   they discuss these cases, to going into a 20-year-old

16   disciplinary proceeding from the state bar in Florida.  All of

17   this.  How they're treating these cases is nowhere near how any

18   other protester would be treated.

19          And on top of all of this -- because this is not enough.

20   On top of all of this, he should also go to jail for 14 days

21   and have a constitutionally impermissible additional sentence

22   of three years of probation, which, as the defense pointed to

23   the Court's attention, simply cannot take place.  And the

24   government even submitted in a supplemental authority

25   submission to the Court yesterday, there's another court here

1    in this jurisdiction that also found that, indeed, the -- you

2    cannot jointly have probation and incarceration.

3            But this is the government's position; that nothing is

4    enough.  Nothing is enough, and we need to go above and beyond,

5    above and beyond.  And at the end of the day, we're still back

6    to the original offense at hand.  And it's more than

7    sufficient.  And as we pointed out in terms of, you know,

8    societal deterrence, as we pointed out in our pleadings,

9    society has deterred.  People aren't showing up at protests at

10   the front of the Capitol.  They're scared.  There were more

11   media and more police than protesters at the last protest in

12   front of the Capitol.

13           These people are genuinely frightened of protesting.

14   The American people are frightened of protesting.  They're

15   frightened of the federal government.  The American people are

16   frightened of the FBI.  And we're seeing this play out in real

17   time in front of the Capitol, in front of the protests that are

18   scheduled.  And to say that that is not enough, to say that

19   society is still not adequately deterred, well, Judge, I -- I

20   don't know what would be.

21           I don't see how putting everyone in jail and also

22   telling people they should be afraid of protesting is what

23   society needs as a deterrent.  Because that's certainly not the

24   case.  And it should never be that individuals feel that they

25   cannot protest.  Because it wasn't the protest that is being

1    punished.  It's a locational protest in this particular case or

2    violence that came from it in some of the other cases.  It's

3    not the protest itself.

4         But when the government makes claims that, well,

5    Mr. Stepakoff isn't remorseful because he did not take back his

6    politics, now that is a problem.  So that is something that

7    happened in this case where the defendant says to the

8    government, I wished I did not protest in the Capitol.  I

9    wished I did not go in, because had I known that it was

10   unlawful, I would have turned around.  He had this conversation

11   with them.  He repeated this multiple times.  He repeated it to

12   his pretrial probation officer.  This was a constant issue.

13        And he's very remorseful this happened because he really

14   wishes he didn't break the law.  But what he did not say --

15   what the government wanted him to say -- is that he wishes he

16   did not protest, period, or that he wishes he could reverse his

17   politics or something of that nature.  That wasn't done in this

18   case.

19        And that's where the government all of a sudden is now

20   making claims, well, he's not sufficiently remorseful.  But,

21   indeed, he is.  He didn't know.  He's not going to lie and say

22   he knew.  He didn't know; because he will not lie, not even to

23   appease the federal government.  He will not lie and say that

24   he knew that it was unlawful to enter the Capitol.  He simply

25   will not say that.  I will not allow him to say that, and he

1    doesn't want to say that because that's a lie.  And we're not

2    going to do that to this Court.  He didn't know.

3         If the government wants to say that, that's a bad thing

4    and he should be punished more severely than somebody who

5    knowingly violated multiple laws, that's something different.

6    But he didn't know.  And -- nor do I think he should be

7    punished more severely for that, but that's a whole different

8    issue.  But it didn't happen.

9         What the government wanted for him to say is that he

10   knew and he still went in and also he takes back his politics.

11   And that's simply not the case here.  He didn't know, and the

12   politics isn't what caused for him to go inside the Capitol.

13   He wasn't motivated by any kind of political nature to go

14   inside.  It was simply an extension of his already-there

15   protest.  He wasn't specifically going inside to achieve any

16   kind of purpose.  That's not alleged in the government's

17   statement of facts either.

18        He personally didn't have any kind of purpose, other

19   than following the crowd in and exiting, in his protest.  It

20   wasn't to achieve any other political means other than to

21   continue his protest.  It's just a locational issue for him.

22   The location where his protest took place, that is what was

23   unlawful.  That is the evidence here.

24        In terms of the politics involved and the various

25   allegations being made against the government in a variety of

1    these cases, that they're prosecuting these more harshly; and

2    something we brought out as well compared to defendants with

3    other politics.  That's simply present; that we're simply

4    seeing these prosecution disparities.  And what are we supposed

5    to do with that?  What are we supposed to do when we see that?

6    We have to highlight it for the Court, because the Court needs

7    to see that defendants who committed more serious offenses

8    inside the Senate chambers, those defendants are getting more

9    lenient deals.

10        At the end of the day, what Mr. Stepakoff did was walk

11   into a Capitol for 5 minutes unlawfully.  He should not have

12   been there.  He shook hands.  He walked out.  That is his

13   conduct.  What he posted online afterwards doesn't lay claim to

14   anything different than what he told the FBI.

15        None of his politics were any -- kind of extraordinary

16   or dangerous.  He wasn't claiming that anything violent should

17   happen.  The government actually conceded and actually made a

18   point saying I don't believe the violence, but it might come to

19   it.  And he's saying that based on what -- the idea of these

20   elections and whatnot.  This is an individual who was present

21   on January 6th.  And instead of saying it already has come to

22   it, he said one day it might come to violence.  That is what he

23   said because -- and that is further proof that he did not see

24   on that day a level of violence.  Because he thought all these

25   people protesting might one day evolve into violence.  That is

1    what he thought, and that is what he was warning.

2         And he said, "I don't believe in violence.  I don't

3    believe in violence."  And why not?  Because he's a rabbi, he's

4    a man of God, and he's talking to his congregation at the end

5    of the day.  That's what these videos all were.  He's

6    communicating with his congregation, his people.

7         And he committed an offense.  It's a locational protest

8    offense.  It was certainly on the wrong day; that we --

9    certainly wishes he wasn't there.  He certainly wishes he

10   didn't go inside the Capitol.  But in terms of taking back

11   politics or taking back any of that type of, you know,

12   emotional connection to it, it wasn't part of why he entered

13   the Capitol.  And for that reason it's not something that he

14   should have to take back or anyone else.

15        The government, I think, should be very concerned about

16   society and the public.  As we pointed out, too, in our

17   pleadings, they owe a duty not just to an incarcerated

18   defendant, but it's a duty to the people and also to the

19   defendant.  And that's where, you know, a lot of due process

20   litigation comes from, a lot of *Brady* material.  The

21   government, for example, has to turn over evidence to the

22   defense even if the defense doesn't ask for it.  These are all

23   obligations the government has to the defendant.

24        Because at the end of the day, it's supposed to be an

25   equitable prosecution.  It's not supposed to be a persecution.

1          It's not supposed to be disparate treatment.  None of that is

2     supposed to be taking place.  But, unfortunately, that's what

3     we've seen in a lot of these cases, especially with this one,

4     as far as the sentencing requests.  That's quite a bit of what

5     we're seeing here.  And so we did point that out to the Court

6     because we have to.  It's our duty to make sure that the Court

7     is aware of what's been happening.

8          The government noted that the defendant should not feel

9     deceived by the negotiations because the plea agreement did not

10    have the sentence outline.  We agree the plea agreement did not

11    have that sentence outline.  We didn't claim it did.  We put it

12    into a footnote what was taking place between the parties

13    because it was such an unusual situation; where the government

14    throughout their conversations with Mr. Stepakoff, two

15    prosecutors -- multiple prosecutors conveyed to the defense we

16    don't expect for the government to be seeking jail time in this

17    case.  Because we were all in the same boat where

18    Mr. Stepakoff's conduct certainly isn't very serious compared

19    to other defendants.

20         We didn't expect jail time.  And so we were reading

21    about it over and over again.  There was no promises,

22    absolutely no promises made, but it was conversational.  It was

23    an understanding of the case.  Unless, the government said, we

24    find out something in his interview or something else comes up

25    that we did not know about, and, of course, that's

1    understandable.

2         But that's not what happened here.  What happened here

3    is the government -- just hours before memoranda were due, the

4    government notified the defense that all of a sudden they're

5    requesting 14 days in jail, plus three years of probation.  And

6    that was just shocking because that certainly wasn't anything

7    we discussed previously.  And the factors that the government

8    pointed to, the fact that he's a lawyer -- and all that was

9    known to them.  And the fact that he's a lawyer --

10        Another important point of consideration for the Court

11   is the *Clinesmith* case.  That was a lawyer.  That was an FBI

12   lawyer.  That FBI lawyer committed an act of dishonesty while

13   employed for the FBI and with civilian victims.  Based on that,

14   there's an additional lawsuit right now.  Mr. Carter Page --

15   Dr. Carter Page is suing him right now.

16        And the government doesn't discuss that case.  But in

17   that case, the sentence is relevant as well.  Because even in

18   that case, where a lawyer lies in the course of the performance

19   of his duties for the federal government with a civilian

20   victim, he still did not receive jail time.  He received

21   one-year probation and some community service and a fine, I

22   believe.  I'm trying to recall the exact number of that.  But

23   there wasn't even jail time in that case, and it was one year

24   of probation.

25        You know, certainly in terms of comparing the fact that

1       he's a lawyer wouldn't matter.  It matters for sentencing

2       disparity purposes.  But the government ignores that case and

3       says, well, no, Mr. Stepakoff is a lawyer.  And he went into

4       the Capitol 22 years after practicing local Florida law, which

5       has absolutely nothing to do with the Capitol or federal law or

6       any of that, and he should go to jail because of that.  That

7       doesn't make any sense.  That's just completely outlandish.

8              And so the Court was saying, Mr. Stepakoff -- and I'll

9       have Mr. Stepakoff make a statement shortly.  He does wish to

10      address the Court.  We will have him address the Court.

11             But as we go back to our pleadings that we submitted to

12      the Court, I pointed out a variety of issues that are

13      problematic on the government's side.  We also pointed out

14      to -- pointed to what the defendant actually did.  And we're

15      saying, yes, the penalty here should be $50 because that is

16      what the penalty was for other protesters who were similarly

17      situated -- Ms. Steingraber and others like her -- and other

18      individuals at the Capitol and those individuals who actually

19      had done worse because they had disrupted proceedings.

20             Mr. Stepakoff -- and we discussed the proceeding issue

21      tangentially here, but in terms of -- he was there at 3:00 p.m.

22      So he personally did not disrupt the initial proceedings from

23      ceasing.  We also are not sure -- and I don't think the

24      government knows full well, which they have not provided to us

25      that information in any way, why the Senate and the House

1    recessed initially.

2          And it does appear from testimony from Congress that the

3    House was recessed because of the pipe bombs that were

4    discovered in the RNC and DNC buildings and there was concern

5    there might be something around the Capitol as well, and that

6    is why the House resumed proceedings later, technically resumed

7    in the middle of this crowd convening to interrupt based on the

8    government's timeline.  Regardless, Mr. Stepakoff was there

9    after 3:00 p.m.  And so at that point, again, what is his

10   conduct?  And that's what we're trying to bring the Court's

11   attention back to.

12         And so I do think that a $50 fine is appropriate.  And

13   this is not his only penalty, because his penalty is also a

14   conviction, a criminal record, a permanent criminal record.

15   His penalty is also the one year of pretrial supervision that

16   he's been on and, of course, the public ridicule and the media

17   that's watching this hearing and all the other hearings and

18   writing about it.

19         I mean, this is all public shame, and this is all part

20   of the sentence, and this is all part of public deterrence,

21   both for him and for the public.  It's more than sufficient.

22   It's more than sufficient.  And I think that the $50 penalty --

23   also considering that he's already paid the $500 restitution,

24   just to show good faith, I think all of that really points to

25   the fact that Mr. Stepakoff's equitable penalty in this case is

```
1    $50, and that's how we should conclude this case.

2         Thank you, Judge.

3              THE COURT:  All right.  I'll hear from Mr. Stepakoff,

4    but you put my court reporter through a Peloton-like workout.

5    I'm going to take a five-minute break, and we'll come back and

6    hear from Mr. Stepakoff.

7              (Recess taken.)

8              THE COURT:  Back on now?

9              THE COURT REPORTER:   (Nods head.)

10             THE COURT:  All right.  Mr. Stepakoff, you did

11   want --

12             MS. PROUT:  Your Honor, I did want to request an

13   opportunity to very briefly respond to a couple of the points

14   made by the defense.  I didn't know if you'd like the

15   government to do that before or after Mr. Stepakoff speaks.

16             THE COURT:  Which points?

17             MS. PROUT:  There were just a few factual

18   clarifications that the government wanted to make regarding

19   some of the evidence that the defense discussed.  I can be very

20   brief.

21             THE COURT:  Let me hear from Mr. Stepakoff first.

22             MS. PROUT:  Thank you.

23             THE DEFENDANT:  Thank you, Your Honor.

24        Entering the Capitol was a terrible mistake on my part.

25   I deeply regret it.  I wish I could take it back, but I can't.
```

1     It was not done in defiance nor as an act of civil disobedience

2     or anything like that but simply because I failed to properly

3     appreciate the situation.

4          That day I went up Pennsylvania Avenue, along with

5     throngs of people, and I followed the crowd and entered through

6     an open door of the Capitol Building in the plain view of law

7     enforcement, both inside and outside of the Capitol.  People

8     were being allowed to flow into the Capitol.  No arrests were

9     being made.  No warnings and no instructions were given to

10    leave the premises, which I would have done immediately.  No

11    violence was taking place, and there was a lot of friendly

12    engagement between the protesters and law enforcement.  All of

13    what I describe is clear to see in the CCTV video.

14         Although in hindsight I now know that I was clearly

15    mistaken, it did seem at the time that the protest, which I had

16    come to D.C. to be a part of, was continually -- was continuing

17    lawfully and without any objection from law enforcement inside

18    of that -- that lobby, which I now know is called the Senate

19    wing, which is where I entered.

20         I originally went to Washington to witness a historic

21    event and to let my voice be heard as part of it.  And this

22    seemed like a pivotal and historical moment in our country.

23    And whatever the outcome, I just wanted to be a part of it and

24    witness it, be able to talk about it over livestream and with

25    friends back home.  If the GOP candidate lost, so be it.

1    There's always another election two years and then four years

2    later.  That's America.

3         I was horrified to learn of the chaos and violence that

4    broke out, which totally contradicted and undermined the whole

5    point of the gathering.  I had no part in any of that, nor did

6    I witness it.  If I had witnessed it, I would have made an

7    immediate U-turn and returned back to my hotel.  I accept that

8    entering into the Capitol was not lawful, and I was wrong to

9    think that it was.  I did not exercise good judgment, even

10   though I was only in there for a few minutes in one small area,

11   and all I did inside was lean up against a wall and take some

12   selfies.  And even though -- I complimented the officers, I

13   said thank you for your service, we love you, God bless you,

14   and then I exited.  Still, I had no right to be there, and I

15   accept that.  And that's why I pled guilty to the unlawful

16   parading charge.

17        I do feel that I failed to properly assess and

18   understand the situation, and I deeply regret it.  I've got

19   great remorse about it.  There's a lot of things I have to live

20   with because of it, hurt that I've caused to myself and to

21   others, and I deeply regret it.  I take full responsibility for

22   that failure.

23        Thank you.

24             THE COURT:  I have a few questions for you.  And, you

25   know, you and I are about the same age.  In fact, I think we

1    overlapped for a year at Florida State.  And you might recall

2    when we were kids we used to watch a cartoon named Mr. Magoo,

3    and that's essentially how your counsel has characterized you.

4    You just stumbled through the events with -- oblivious to all

5    the mayhem around you, which, you know, Magoo-like characters

6    generally don't get through college and go to law school.

7         So it's a little bit hard to square what you're saying

8    now and the arc of your life.  You did not -- when you took

9    those photos in front of the fence with the signs that said

10   closed to the public, you did not understand that the Capitol

11   was closed?

12        THE DEFENDANT:  I didn't because I was flowing with

13   the crowd.  And I should have.  I wish I had.  I wish I had

14   understood it and -- and wouldn't be sitting here right now, I

15   guess.  But I was flowing with the crowd.  There were thousands

16   of people in that area, and nobody was clashing with police or

17   anything like that.  So I just really didn't pay attention to

18   it the way I should have.

19        THE COURT:  You didn't hear the alarms going off?

20        THE DEFENDANT:  No, Your Honor.  There definitely

21   were no alarms.  I mean, that definitely wasn't happening.

22        And I -- I'll ask Your Honor to consider that I'm not a

23   person that would take lightly the idea that I might be

24   breaking the law.  I mean, there's no way that I would take

25   that kind of risk with my life, my career, my family to just --

1    just in a flippant way just ignore the law and put myself at

2    risk of being arrested and going through everything I'm going

3    through now.  I just did not assess it properly, and I just

4    didn't see it that way at the time.  It was my mistake.

5              THE COURT:  When you went through those doors, you

6    didn't see that the glass had been broken out?

7              THE DEFENDANT:  No, sir, I did not see that.

8              THE COURT:  How about chemical -- was there a

9    chemical smell in the air?

10             THE DEFENDANT:  I didn't notice that, and I wasn't

11   wiping my eyes in the video or anything like that.  I didn't

12   notice that.  It seemed like a friendly environment.

13        I think, looking back on it, that what impressed me the

14   most was that -- the presence of law enforcement.  Normally if

15   you commit a crime right in front of eight or ten police

16   officers, you're going to be arrested.  And there wasn't any --

17   anybody being arrested.  There wasn't -- and I don't mean to

18   sound like I'm blaming someone else because I'm not.  Those

19   brave and noble officers deserve all the credit in the world.

20   That's why I thanked them.

21        But if somebody had stood there with a megaphone and

22   said:  Warning.  You are trespassing on government property.

23   Leave the premise immediately, I would have gotten out of there

24   in a heartbeat.  It just -- it just seemed like it was being

25   allowed at the time.  I never said that they opened the doors

1    and ushered people in.  That didn't happen where I was, but it

2    just seemed like, at the time, that the protests that I had

3    come to be a part of -- which the President said, you know, now

4    we're going to peacefully and patriotically march to the

5    Capitol, it just seemed like it was carrying on there.  And I

6    was wrong.  I was mistaken, and -- and I regret it.  And that

7    was my state of mind at the time, sir.

8              THE COURT:  So in the video, you spend a lot of time

9    looking down at your phone.  Were you following contemporaneous

10   reports of what was occurring?

11             THE DEFENDANT:  No.  I was -- I believe I was trying

12   to delete some pictures because the -- my phone had reached its

13   capacity.  And I was trying to take a few more pictures.  I

14   can't recall exactly.  There were some cell -- cell phone

15   messages that may have come in, but I don't -- I don't remember

16   specifically.  But I don't think I was getting good cell phone

17   coverage inside there, but my -- my main focus was to try to

18   take some pictures.

19             THE COURT:  You didn't read any contemporaneous

20   accounts that characterized what happened as a breach of the

21   Capitol?

22             THE DEFENDANT:  No, Your Honor.

23             THE COURT:  All right.  So let's start with the

24   financial issues.  So the restitution has been agreed to by

25   the parties, and that's $500, which I'm told has already been

1   paid.

2          With respect to a fine, the maximum fine is $5,000.

3   Although probation indicated that the defendant has an ability

4   to pay, that given the expenses and income, they recommend only

5   a modest fine.  I intend to impose a fine to compensate the

6   government for its supervision of defendant for the past year

7   and into the next, which combined with -- amount to $742.

8          The Court is to impose a fine -- rather, is to impose a

9   sentence sufficient but not greater than necessary to comply

10  with the purposes set forth in the subsection.  I'm to consider

11  the nature and circumstances of the offense and the history and

12  the characteristics of the defendant and impose a sentence that

13  reflects the seriousness of the events, promotes respect for

14  the law, and provides just punishment for the offense.

15         Of course, the offense is serious.  A number of my

16  colleagues have spoken very eloquently about this.  Defendant

17  took part in the mob riot that took place at the Capitol on

18  January 6th, 2021.  Many of the rioters engaged in violence and

19  some destroyed property.  I have watched numerous videos of

20  rioters engaging in hand-to-hand combat with police officials.

21         It was not a peaceful event.  More than a hundred law

22  enforcement officers were injured on that day.  Moreover, the

23  Capitol sustained almost $1.5 million in property damage.  Many

24  of the rioters intended to block the certification of the votes

25  for President Joe Biden, and although the rioters failed to

1    block the certification, they delayed it for several hours.

2          The security breach forced lawmakers to hide inside the

3    House gallery until they could be evacuated to undisclosed

4    locations.  In short, the rioters' actions threatened the

5    peaceful transfer of power.  That is a direct attack on our

6    nation's democracy.

7          With that said, no evidence has been presented that

8    shows the defendant assaulting law enforcement or destroying

9    property.  After entering the Capitol Building through an

10   entrance at which law enforcement had been overwhelmed a short

11   time beforehand, in which clearly showed evidence of forced

12   entry, such as broken windows, defendant entered and lingered

13   for about 5 minutes.  The riot was successful in delaying the

14   certification, in large part, because of the numbers of

15   participants involved, which simply overwhelmed the outnumbered

16   law enforcement officers present.

17         Regardless of the defendant's intentions, because he

18   contributed to these numbers, he must be held accountable for

19   his actions and the results to which his actions contributed.

20         Otherwise, defendant has no criminal history.  He's a

21   56-year-old man with a bachelor's degree and a law degree.  He

22   practiced law for a number of years and now serves as a rabbi.

23   In his sentencing memos and today, he attempts to diminish his

24   culpability by portraying himself as a Mr. Magoo-like character

25   that stumbled into and entered the Capitol oblivious to the

1    mayhem around him.  The government has presented persuasive

2    evidence indicating that this characterization is highly

3    suspect.  The defendant is a highly educated individual who the

4    Court finds is highly unlikely to have been so oblivious.

5         Otherwise, defendant's background is unremarkable.  He

6    grew up in an intact and loving family.  All of his needs were

7    provided for, and he received an advanced education.  He has

8    always been gainfully employed and appears to have a strong

9    family support system in place.

10        The Court is to impose a sentence that affords adequate

11   deterrence to criminal conduct, protects the public from

12   further crimes of the defendant.  The events of January 6th

13   involved a rather unprecedented confluence of events spread by

14   then President Trump and a number of his prominent allies who

15   bear much responsibility for what occurred on that day.

16        Since defendant's arrest, he seems to have done well on

17   release status, and the Court is confident that given his prior

18   lack of criminal history and lack of a violent past that he is

19   unlikely to reoffend, will not be emotionally swept up in

20   irrational actions, and will pose no risk to the public.

21        With respect to general deterrence, the Court does not

22   believe that incarceration is necessary to deter other

23   nonviolent protesters from crossing the line to law breaking.

24   The defendant's ordeal through the criminal justice system,

25   fines, restitution, community service, and probation with home

1  confinement should serve as an adequate deterrent to those that

2  can be deterred.

3      No one has brought any issues to my attention concerning

4  a need for education or vocational training, medical care, or

5  other correctional treatment in the most effective manner.

6      The Court is to consider the kinds of sentences

7  available.  Given the nature of the crime and the defendant's

8  lack of criminal history, the Court is considering a period of

9  probation that contains restrictions and imposes home

10  confinement for a period of time.  Even if the Court were

11  inclined to consider a short term of incarceration, it would

12  not be prudent to impose such during the COVID pandemic.

13      The Court is to consider the kinds of sentence and the

14  sentencing range established for the applicable category of

15  offense committed by the applicable category of defendant set

16  forth in the guidelines.  As indicated and agreed to by all,

17  the guidelines do not apply in this case, and no pertinent

18  policy statements issued by the Sentencing Commission have been

19  brought to my attention.

20      The Court is to impose a sentence that avoids

21  unwarranted sentence disparities among defendants with similar

22  records who have been found guilty of similar conduct.  The

23  government has provided a chart that lists a number of the

24  January 6th defendants' sentencings.  But as I indicated

25  previously, there is not enough granular information to make

1    apt comparisons.  However, the list does make it clear that the

2    government has recommended noncustodial home confinement

3    probation sentences in a number of these cases.  And the Court

4    finds it hard to distinguish those cases from this case.

5         But the Court finds given the size, scope, and impact of

6    the January 6th mob riot presenting a direct challenge of this

7    country's bedrock democratic principles, the defendant's

8    attempt to compare and contrast the treatment of the

9    January 6th defendants to that of the defendants who attempted

10   to derail the Kavanaugh confirmation hearing falls flat, and

11   the Court doesn't find those defendants comparable to the

12   defendants in the January 6th cases.

13        We've already dealt with restitution.  And I will now

14   indicate the sentence to be imposed, but counsel will have one

15   more opportunity to make any legal objections before the

16   sentence is actually imposed.

17        Ms. Medvin, do you have any objections to any of the

18   factors I'm considering?

19        MS. MEDVIN:  I -- I believe the issue of home

20   confinement is still an incarceration.  And so I -- I

21   understand -- with the Court's indulgence, I'll pull up the

22   code section to review it once more considering the judge's

23   consideration of home confinement.  But my understanding of

24   that is while it can be ordered with probation to supervise,

25   nonetheless, it's a type of incarceration.

1      And for purposes of Class B misdemeanors, which are

2   petty offenses, I think it would amount to a higher penalty

3   than if he had been sentenced to a more serious offense.  And

4   so it might be an issue specific to Class B misdemeanor, petty

5   offenses.

6      THE COURT:  I disagree.  It will be part of the

7   probation, but you can preserve that argument.

8      Ms. Prout, do you have any objections to any of the

9   factors I've considered?

10      MS. PROUT:  I do not, Your Honor.

11      THE COURT:  All right.  Mr. Stepakoff, it is the

12   judgment of the Court that you are hereby sentenced to serve a

13   12-month term of probation on Count 4.  This term of probation

14   shall include a 2-month term of home confinement with location

15   monitoring.

16      You are further ordered to pay a special assessment of

17   $10 and a fine of $742 as to Count 4.  The special assessment

18   and fine are payable to the Clerk of the Court for the

19   U.S. District Court, District of Columbia, within 30 days.  You

20   are ordered to make restitution to the Architect of the Capitol

21   in the amount of $500, although I understand that that has

22   already occurred, but it will be in the judgment and commitment

23   order.  Within 30 days of any change of address, you shall

24   notify the Clerk of the Court of that change until such time

25   that the financial obligations are paid in full.

1          While on supervision, you shall not use or possess an

2     illegal controlled substance; and you shall not commit another

3     federal, state, or local crime.  The mandatory drug testing

4     condition is suspended based on the Court's determination that

5     you pose a low risk of future substance abuse.

6          You shall also abide by the general conditions of

7     supervision adopted by the U.S. Probation Office, which will be

8     set forth in the judgment and commitment order, as well as the

9     following special conditions:  During your period of home

10    confinement, you will be subject to location monitoring in

11    order to enforce that requirement of home confinement, and you

12    shall be monitored by radiofrequency or GPS monitoring at the

13    discretion of the probation office supervising your probation,

14    and shall abide by all technology requirements for a period of

15    two months.

16         This form of location monitoring technology is ordered

17    to monitor the following restrictions on movement in the

18    community, as well as other court-imposed conditions of

19    release.  You are restricted to your residence at all times

20    except for employment; education; religious services; medical,

21    substance abuse, or mental health treatment; attorney visits;

22    court appearances or court-ordered obligations, including

23    community service; or other activities as preapproved by the

24    probation office.

25         There will be a requirement of financial disclosure

1  until the financial obligations are paid and satisfied, and

2  those will be set forth in the judgment and commitment order.

3          You must complete 60 hours of community service within

4  6 months, and the probation office will supervise the

5  participation in the program by approving the program, and you

6  must provide written verification of the completed hours to the

7  probation office.

8          Counsel, any reasons other than those previously stated

9  and argued why the sentence should not be imposed as stated?

10         Ms. Medvin?

11             MS. MEDVIN:  No, Judge.

12             THE COURT:  Ms. Prout?

13             MS. PROUT:  No, Your Honor.

14             THE COURT:  The sentence is as stated.

15         I gather that charges in Counts 1, 2, and 3 need to be

16  dismissed as -- from the information; is that correct?

17             MS. PROUT:  Yes, Your Honor.  The government so moves

18  now.

19             THE COURT:  (Inaudible) as well.

20             THE COURT REPORTER:  Judge, we couldn't hear that

21  first part.

22             THE COURT:  I understand that charges in Counts 1, 2,

23  and 3 of the information need to be dismissed, and we'll do

24  that as part of the judgment and commitment order.

25         So, Mr. Stepakoff, you were convicted by a plea of

1  guilty.  You can appeal your conviction if you believe that

2  your guilty plea was somehow involuntary or if there's some

3  other fundamental defect in the proceedings that was not waived

4  by your guilty plea.

5      You also have a statutory right to appeal your sentence

6  under certain circumstances to the extent not waived by your

7  guilty plea, and your guilty plea has waived a number of

8  appellate rights.  But if you're inclined to appeal, consult

9  with your attorney.

10     You have the right to apply for leave to appeal in forma

11  pauperis.  That means without -- without cost, and if you

12  request and qualify, the Clerk of the Court will prepare and

13  file a notice of appeal on your behalf, although I note that

14  you're represented by very able counsel who can assist you in

15  that process.

16     Most importantly, with few exceptions, any notice of

17  appeal must be filed within 14 days of the entry of the

18  judgment, and I expect that the judgment will probably be

19  entered early next week.  So 14 days from that point.

20     Probation has requested that the jurisdiction for the

21  supervision be transferred to the Middle District of Florida.

22  Does anyone have any objection to that?

23         MS. PROUT:  No, Your Honor.

24         MS. MEDVIN:  No, Judge.

25         THE COURT:  I'll go ahead and submit the paperwork

1     for that once it's submitted to me from probation.

2          Anything else that we need to accomplish today,

3     Ms. Medvin?

4          MS. MEDVIN:  Two things.  I wanted to bring to the

5     Court's attention that my client's passport was taken in the

6     Middle District of Florida and, apparently, was sent to the

7     District of Columbia, and now there's a transactional problem

8     in terms of where to file to -- for the return of the passport.

9     And so we ask if the Court can somehow mention this -- the

10    release of his passport as part of his conditions.  So that's

11    number one.

12         And number two, the issue of the release of the CCTV

13    footage that we relied on as evidence.  It's under highly

14    sensitive designation under the protective order, and now that

15    it's been part of the proceedings, we'd ask that it be released

16    from the confines of that order.

17         THE COURT:  Ms. Prout.

18         MS. PROUT:  Your Honor, the government has no

19    objection.

20         And -- and on the same subject, the government does ask

21    to formally admit the government's exhibits that were submitted

22    in chambers as well.

23         THE COURT:  I'll formally admit both parties'

24    exhibits, all of which I've reviewed prior to today's hearing.

25    And I will submit an order making the CCTV exhibit and all the

1    other exhibits I relied upon available as I've done in other

2    matters.  Let me write that down.

3             Okay.  If nothing further, you're excused.

4             Mr. Stepakoff, I don't expect to ever see you again,

5    except for perhaps at a Florida State alumni event.  But good

6    luck to you, sir.

7             THE DEFENDANT:  Thank you.  You won't, Your Honor.

8             Can I ask one thing?  How do I proceed from here?

9    Should I get in touch with Ms. Baker or someone --

10             THE COURT:  Get in touch with your counsel.

11    She'll usher you through any issues you need.

12             All right.  Thank you.

13             (Proceedings were concluded at 12:55 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3            I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                         Dated this 27th day of January, 2022.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25